*1011
 
 OPINION
 

 Per Curiam:
 

 On December 1, 1994, Antoine Liddell Williams was charged with the commission of seven felonies, including: first-degree murder, victim sixty-five years of age or older; first-degree murder with use of deadly weapon, victim sixty-five years of age or older; burglary, robbery, victim sixty-five years of age or older; robbery with use of deadly weapon, victim sixty-five years of age or older; possession of stolen vehicle; and possession of controlled substance.
 

 On December 5, 1994, the State filed a notice of intent to seek the death penalty, alleging the following aggravating circumstances: Williams committed the murders during a burglary, during a robbery, to avoid or prevent a lawful arrest, and to receive money or any other thing of monetary value and he has been convicted of more than one offense of murder in the first degree.
 

 In October 1995, a jury found Williams guilty on all seven counts. The penalty hearing began on October 23, 1995, but the jury was unable to reach a unanimous verdict. Over Williams’ objection, a three-judge panel was convened, and a second penalty hearing was conducted. The three-judge panel, concluding that the aggravating factors outweighed any mitigating factors, sentenced Williams to death on both first-degree murder counts. On March 29, 1996, the court entered the judgment of conviction and warrant of execution.
 

 Williams appeals, challenging both his convictions and sentences of death, alleging that the district court erroneously admitted his confession, admitted unduly prejudicial photographs, failed to give adequate jury instructions, denied his motion to empanel a new jury for sentencing, denied him a fair trial due to prosecu-torial misconduct, and denied his motion to argue last at the penalty hearing.
 

 We conclude that Williams’ arguments are without merit and affirm both his convictions and sentences.
 

 
 *1012
 

 FACTS
 

 Antoine Liddell Williams, a resident of Illinois, had been staying at his girlfriend’s apartment a few doors away from the residence of William and Alice Nail in Las Vegas. On August 17, 1994, Kathleen Dupree reported a maroon Datsun 280-Z stolen from in front of her home in Las Vegas. On August 26, 1994, Williams drove William Nail to the Las Vegas airport in Dupree’s stolen car. Because his own car would not start due to a problem with the battery, Mr. Nail had requested the ride to the airport to pick up his son, James Nail. At the airport, Mr. Nail and his son rented a car to return to the Nails’ residence. Mr. Nail thereafter told his son that he had given Williams $20.00 for the ride to cover the cost of gasoline.
 

 Three days later, Williams knocked at the Nails’ front door. Williams asked about the condition of Mr. Nail’s car and asked to see the new battery. Mr. Nail invited Williams in and escorted him through the house into the garage. While alone in the garage with Mr. Nail, Williams asked for and received a $40.00 loan.
 

 On Friday, September 2, 1994, Williams decided that he needed money to purchase drugs, but that he was not willing to rob a store. He thought he could get the cash from the Nails. Williams took a lamp cord from the apartment where he was staying, and went to the Nails’ apartment. Williams knocked on the front door and was invited in by Mr. Nail. The two men went into the garage, where Williams asked Mr. Nail for another loan. After Mr. Nail refused the loan, Williams removed the lamp cord from his pocket and strangled Mr. Nail. Mr. Nail fell to the floor, and Williams kicked him in the head to ensure that he would not recover.
 

 Williams then entered the kitchen where Mrs. Nail was preparing a meal. When she turned her back, Williams used the same lamp cord to strangle Mrs. Nail. As she struggled, Williams took a knife from the kitchen counter and stabbed Mrs. Nail in the throat. When she fell to the floor, Williams kicked her in the head.
 

 Williams took Mr. Nail’s wallet, Mrs. Nail’s purse and a radio, and placed them in a container. He left the Nails’ home with a VCR, and closed the door behind him. When he realized he had forgotten the container with the other items, Williams kicked in the Nails’ front door to regain entry. He also took some jewelry boxes.
 

 Upon leaving the Nails’ home, Williams pawned the VCR, using his own name, and received $35.00. He then purchased cocaine. At some later time, he found an ATM card and personal
 
 *1013
 
 identification codes in Mr. Nail’s wallet, and withdrew as much money as the bank allowed from Mr. Nail’s account.
 

 On September 4, 1994, Williams rented a room at a Las Vegas motel, using his own name. That evening, a police officer watched Williams and two women walk out of the motel and around the corner. The officer then saw the same three people leave the parking lot in a maroon Datsun 280-Z. The officer checked the license number and was advised that the car had been reported stolen. He called for back-up and then pulled over the car. After the stop, Williams exited the car and was handcuffed. A back-up officer read Williams his
 
 Miranda
 
 rights. The arresting officer heard Williams acknowledge that he understood his rights. A cursory search of the vehicle resulted in the officers’ finding numerous ATM receipts, an ATM card and other identification bearing Mr. Nail’s name, and a “free-base kit” used for smoking crack cocaine.
 

 An officer transported Williams to the Clark County Detention Center, and, en route, Williams initiated a conversation regarding the possible charges against him.
 
 [1]
 
 The officer responded by listing several possible charges, among them possession of a controlled substance.
 

 A subsequent search of the vehicle revealed an Excedrin bottle containing a substance later identified as cocaine, two jewelry boxes, keys, an electrical cord, two rolls of tape and a pair of Fila tennis shoes. Credit cards, telephone cards, ATM cards and an automobile registration in the name of James Nail and William Nail were also found.
 

 Two officers attempted to reach the owner of the ATM card, Mr. Nail. The officers went to the Nail residence and observed that the door had been kicked in. They entered the apartment and found Mrs. Nail’s body in the kitchen and Mr. Nail’s body in the garage.
 

 A forensic pathologist determined that Mr. Nail died as a result of asphyxiation due to ligature strangulation and a fractured skull due to blunt trauma to the head. The pathologist reported that Mrs. Nail died as a result of asphyxiation due to ligature strangulation, a stab wound to the neck and blunt trauma to the head.
 

 At the Clark County Detention Center, Williams again was advised of his
 
 Miranda
 
 rights, and he voluntarily signed a waiver form. He then spoke freely with the detectives without expressing a desire to have an attorney present, and subsequently confessed to entering the Nails’ residence, taking property from them, and killing them.
 

 
 *1014
 

 DISCUSSION
 

 Suppressing the confession
 

 A.
 
 Request for Counsel
 

 Williams contends that he invoked his right to counsel at the time of his arrest, when he was first advised of his
 
 Miranda
 
 rights.
 
 See
 
 Miranda v. Arizona, 384 U.S. 436, 475 (1966). Williams argues that after being arrested and transported to the detention center, detectives unlawfully approached him and undertook a custodial interrogation despite his former request for counsel. Edwards v. Arizona, 451 U.S. 477, 484-85 (1981) (Invoking the right to counsel bars further interrogation “unless the accused himself initiates further communication, exchanges or conversations with the police.”). In the course of the custodial interrogation, Williams voluntarily confessed to entering the Nails’ residence, taking property, and killing them.
 

 Both arresting officers testified that Williams was informed of his rights and that at no time did Williams indicate he wanted an attorney present. The State produced a waiver of rights form, signed by Williams prior to his confession.
 

 Determining issues of credibility is within the province of the trier of fact. Howard v. State, 106 Nev. 713, 722, 800 P.2d 175, 180 (1990). On matters of credibility, this court will not reverse a trial court’s finding absent clear error.
 
 Id.
 
 Ruling on Williams’ motion to suppress, the district court stated that there were:
 

 some inconsistencies that Mr. Williams has with the witnesses, but all things being equal the Court is going to deny the motion to suppress the confession because I feel that it was freely and voluntarily given and given properly.
 

 The ruling implies that the court found the two officers’ testimony that Williams did not request counsel more credible than Williams’ testimony that he did request the presence of an attorney. Had the district court found otherwise, it could not have properly denied the motion.
 
 See Edwards,
 
 451 U.S. 477. We conclude that the district court acted within its discretion by finding the officers’ testimony more credible than Williams’, and that the court’s implied finding that Williams had not invoked his right to counsel does not constitute error.
 

 B.
 
 Knowing and Intelligent Waiver
 

 Williams argues that, even if he did not ask for an attorney, he did not knowingly and intelligently waive his rights. In Anderson
 
 *1015
 
 v. State, 109 Nev. 1129, 1133, 865 P.2d 318, 320 (1993), this court held that the validity of a waiver must be decided on a case-by-case basis, considering the accused’s background, experience and conduct, and the facts and circumstances surrounding the waiver.
 

 At the end of the custodial interrogation in which Williams confessed, the detectives prompted Williams to state, on the tape recording, whether the statements he made were voluntary, and whether any promises or deals had been proposed to encourage his confession. Williams stated that the detectives had made it clear that he did not have to say anything to incriminate himself, that he knew the discussion could be stopped at any time and that no deals or offers had been made. He also said, “You’re making sure that
 
 whatever I say will be used in my best interests.”
 
 (Emphasis added.)
 

 Prior to the initiation of questioning, police must fully apprise the suspect of their intention to use any statement to secure a conviction. Moran v. Burbine, 475 U.S. 412, 420 (1986).
 
 Moran
 
 requires that a voluntary waiver of rights be “made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.”
 
 Id.
 
 at 421.
 

 The State argues that Williams was read his rights, including the portion which states that anything he said could be used against him in a court of law, twice: once at his initial arrest, and again immediately prior to his confession. He also signed a waiver card which again stated that his statements could be used against him. Williams argues, however, that his comment about using his statement, “in [his] best interests,” is evidence that he misunderstood the intentions of the law enforcement officers to whom he confessed. Williams contends that since the misunderstanding shows that his waiver was not knowingly and intelligently made, the confession must be suppressed as having been taken in violation of his rights.
 

 Applying the rule from Anderson v. State, 109 Nev. 1129, 1133, 865 P.2d 318, 320 (1993), we must consider that Williams stated that he was familiar with
 
 Miranda
 
 rights from having been arrested previously and from seeing them depicted on television and in movies. Following his arrest, Williams indicated that he understood his rights each time they were read to him. The detective who took Williams’ confession described him as being calm and well-spoken. The State argues that, taken as a whole, these facts and circumstances do not demonstrate that Williams misunderstood his rights. We conclude that, despite Williams’ statement, the district court did not err in finding that he understood his rights and knowingly and intelligently waived them prior to participating in the custodial interrogation.
 

 
 *1016
 

 Admission of photographs
 

 The decision to admit or exclude evidence, after balancing the prejudicial effect against the probative value, is within the discretion of the trial judge. Petrocelli v. State, 101 Nev. 46, 52, 692 P.2d 503, 508 (1985);
 
 see also
 
 NRS 48.035.
 
 [2]
 
 The trial court’s determination will not be overturned absent manifest error.
 
 Petrocelli,
 
 101 Nev. 46, 692 P.2d 503.
 

 Williams argues that two photographs, one of each of the victims at the crime scene, were unnecessarily and extraordinarily gruesome and that their prejudicial effect outweighed any probative value. The State contends that the photographs accurately depict the crime scene and were probative to demonstrate the positions of the victims, footwear impressions, and other circumstances of the homicide.
 

 After reviewing the two photographs, we conclude that the district court did not abuse its discretion in finding that the probative value of the photographs outweighed any prejudicial effect, and in admitting the photographs into evidence.
 

 Jury instructions
 

 Williams asserts that the trial court erred by failing to instruct the jury adequately regarding the distinction between malice aforethought and premeditation/deliberation. Williams had proposed to modify Jury Instruction No. 17 by adding the language, “Deliberate means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed cause (course) of action.” He argues that without the proposed instruction, the jury was unable to understand, analyze or distinguish between malice aforethought and premeditation/deliberation.
 

 In essence, Williams is asking this court to overrule Powell v. State, 108 Nev. 700, 838 P.2d 921 (1992), regarding premeditation as an element of first-degree murder.
 
 Powell
 
 states that so long as the jury instruction comports with the standard outlined in Briano v. State, 94 Nev. 422, 581 P.2d 5 (1978),
 
 [3]
 
 “deliberate
 
 *1017
 
 ness” need not be defined separately. This rule was affirmed in Doyle v. State, 112 Nev. 879, 921 P.2d 901 (1996). Therefore, we conclude that the trial court properly rejected Williams’ proposed instruction.
 

 Motion to empanel a new sentencing jury
 

 Williams contends that the three-judge panel process outlined in NRS 175.556
 
 [4]
 
 violates a defendant’s right to an impartial tribunal and to due process of law by not providing a mechanism for challenging the selection and qualification of panel members, and by returning death sentences more often than juries do. This precise argument has been decided by this court on numerous occasions, and found to be without merit.
 
 [5]
 
 As in
 
 Colwell
 
 and
 
 Riker,
 
 Williams’ counsel failed to provide any not-befo're-considered arguments to persuade this court to overrule its holding in
 
 Paine.
 

 Williams argues that using a three-judge panel to impose a sentence in a capital case violates the Eighth and Fourteenth Amendments. He argues that the selection process invites volunteers, and that the panels are arbitrary and capricious and act as tribunals “organized to return a verdict of death.” Williams contends that the absence of procedural protections in the selection and qualification of the three-judge “jury” violates a defendant’s right to an impartial tribunal, due process and a reliable sentence. Each of these arguments has been addressed, considered and dismissed in recent Nevada Supreme Court cases.
 
 [6]
 
 
 *1018
 
 Applying these holdings to the case at bar, we conclude that Williams’ arguments lack merit.
 

 Prosecutorial misconduct
 

 When no objection is made in the district court, the issue is not preserved on appeal and appellate review is generally precluded unless constitutional questions are raised. McCullough v. State, 99 Nev. 72, 74, 657 P.2d 1157, 1158 (1983). However, the trial court has a duty to ensure that a defendant receives a fair trial. Witter v. State, 112 Nev. 908, 921 P.2d 886 (1996). To this end, the court must exercise its discretionary power to control obvious prosecutorial misconduct sua sponte.
 
 Id.
 
 The relevant inquiry is whether a prosecutor’s comments are so unfair as to deprive the defendant of due process.
 
 Id.
 

 Williams contends that multiple instances of prosecutorial misconduct in the penalty phase of his trial contributed to the jury’s being unable to return a unanimous sentence, causing sentencing to be undertaken by a three-judge panel which ultimately imposed a death sentence. Absent such improper statements, Williams argues, the jury might well have reached consensus, possibly returning a life sentence verdict.
 

 The State argues that during the penalty phase, Williams objected to only one instance of alleged prosecutorial misconduct, and the trial court exercised its discretion in overruling the objection. Further, the State argues that Williams’ allegations are moot because the jury did not impose his sentence at all — -the three-judge panel did.
 

 We will review the alleged errors to see if substantial error did occur. But before we would reverse this case because of prosecu-torial misconduct, it would have to be shown that the errors were of constitutional dimension and so egregious that they denied Williams his fundamental right to a fair jury trial.
 
 See
 
 Ross v. State, 106 Nev. 924, 803 P.2d 1104 (1990).
 

 A.
 
 Mercy as a Sentencing Factor
 

 During the State’s penalty phase rebuttal closing argument, the prosecutor stated:
 

 [Counsel for the defense] talks about mercy and leniency for the defendant. He suggests] that is a mitigating circumstance as well. Perhaps it is. But if the punishment is
 
 *1019
 
 supposedly to mete out justice then the punishment must fit the crime.
 
 When Antoine Williams asks you for mercy and he says that he throws himself at the mercy of the Court, consider the mercy that he gave his two victims.
 

 (Emphasis added.)
 

 Defense counsel’s objection to the argument was overruled by the trial court. The prosecutor continued:
 

 When you take a look at these pictures and you look at what he did to these two victims then you determine what mercy is appropriate.
 

 Williams argues that it is improper for a prosecutor to ask a jury to show the defendant the same sympathy that he showed his victim, citing Lesko v. Lehman, 925 F.2d 1527, 1545 (3d Cir. 1991) (A prosecutor who implores a jury to make a death penalty determination in the cruel and malevolent manner shown by defendant goes beyond the bounds of permissible advocacy.). In this case, Williams’ attorney raised the issue of mercy, and the State was responding to that comment. The
 
 Lesko
 
 case is inapplicable to the facts of this case, and we see no impropriety in the State responding as it did.
 

 B.
 
 Community Standards
 

 The prosecutor made the following remarks in the penalty phase closing argument:
 

 He [Williams] had advantages from the system and he took advantage of the system.
 
 The system failed William and Alice Nail once
 
 because we didn’t hold him in custody so he couldn’t commit the unspeakable. Do not let the system fail them again. When we failed them in the first instance it cost them their lives.
 
 Should we fail in this instance it will take away the meaning and dignity of their lives.
 

 (Emphasis added.) Williams argues that the prosecutor implied that the system’s failure cost the Nails their lives, and that the jury carried the burden of ensuring proper functioning of the criminal justice system in its sentencing of Williams. Williams interprets the prosecutor’s remarks as equating failure of the criminal justice system with returning less than a death penalty.
 

 This court recently stated:
 

 In commenting that anything less than the death sentence would be disrespectful to the dead, we conclude that the prosecutor was merely pointing out to the jury that our society values human life, one who takes a human life in the
 
 *1020
 
 manner that Witter did should have to pay for his crime with his own life.
 

 Witter v. State, 112 Nev. 908, 924, 921 P.2d 886, 897 (1996). Further, Mazzan v. State, 105 Nev. 745, 750, 783 P.2d 430 (1989), indicates that a prosecutor in a death penalty case properly may ask the jury, through its verdict, to set a standard or make a statement to the community. We conclude that the prosecutor’s statement is substantially similar to the prosecutor’s statements in
 
 Witter.
 
 Accordingly, we hold that this statement was proper, and does not constitute prosecutorial misconduct.
 

 C.
 
 Alleged Plea for Jury to Place Themselves in Victim’s Position
 

 The prosecution continued its penalty phase argument by stating:
 

 He didn’t have to kill these people under any scenario that you can conjure up.
 
 Imagine the pain that they went through both physically and mentally.
 
 Mr. Nail, knowing that his life is being snuffed out and worried about his wife in the other room, he doesn’t know what happened, he never did know that she was murdered. And Mrs. Nail the same. Somebody strangling her from behind and she doesn’t know what happened in the garage and she’s dying and she knows she’s dying but she doesn’t even know what happened to her husband and will never know.
 

 (Emphasis added.) A “Golden Rule” argument asks the jury to place themselves in the shoes of the victims, and has repeatedly been declared to be prosecutorial misconduct.
 
 See, e.g.,
 
 Howard v. State, 106 Nev. 713, 719, 800 P.2d 175, 178 (1990); Jacobs v. State, 101 Nev. 356, 359, 705 P.2d 130, 132 (1988). Here, the prosecutor asked the jury to imagine the final moments of the victims’ lives, and we do not consider this a “Golden Rule” argument.
 
 See
 
 Witter v. State, 112 Nev. 908, 921 P.2d 886 (1996). Further, the prosecutor’s remarks were reasonable inferences from the evidence presented.
 

 D.
 
 Diminished Responsibility for the Sentencing Verdict
 

 The prosecutor included the following remarks in his penalty phase closing argument to the jury:
 

 The next step in the long process of justice is the jury makes a decision as to what is an appropriate punishment.
 
 You are not the last step.
 
 You are the next step.
 

 (Emphasis added.)
 

 
 *1021
 
 In Caldwell v. Mississippi, 472 U.S. 320 (1985), prosecutorial misconduct took the form of informing the jury that its decision would be reviewed, therefore lessening the jury members’ sense of duty. The State contends that the prosecutor’s statement is accurate, in that the next logical step is carrying out the jury’s decision. The State argues that the prosecutor did not imply that a review of the verdict would be the next step. The State also contends that, regardless of the statement, the jury was instructed to presume that if it returned a death sentence, it must assume that the sentence would be carried out.
 

 In Mazzan v. State, 103 Nev. 69, 733 P.2d 850 (1987), the prosecutor referred to the process of criminal appeals in murder cases and the possibility of a murder verdict being overturned. In considering this alleged error, we stated:
 

 Mazzan argues that the prosecutor’s remarks mandate reversal. We disagree. Mere reference to the process of appellate review does not invalidate a death sentence. The criminal defendant must also show that because of the nature of the prosecutor’s reference to the process of appellate review, the capital sentencing jury failed to apprehend the gravity of its task in determining whether death is the appropriate punishment.
 

 Id.
 
 at 72, 733 P.2d at 851. We do not believe this one remark in any way reduced the jury’s appreciation of the gravity of its task. While prosecutors would be better off refraining from remarks about the future criminal processing of the case, an isolated reference to future steps in the case does not amount to prosecu-torial error.
 

 E.
 
 Prosecutor’s Expression of Personal Beliefs
 

 At the penalty hearing, Williams argued for a life imprisonment sentence based on the concept that he could provide a positive role model for other inmates and for youth who were on the threshold of a criminal lifestyle. Attacking that argument, the prosecution stated:
 

 The question becomes this: It’s a balancing decision. On the one hand you have the possibility that this defendant can become a role model, and
 
 I agree with [the District Attorney], that is suspect.
 

 (Emphasis added.)
 

 It is improper for a prosecutor to interject his personal opinion in closing argument. Ross v. State, 106 Nev. 924, 803 P.2d 1104
 
 *1022
 
 (1990). However, in this case, the deputy district attorney was responding to the argument that Williams could become a model prisoner by referring to the opening remarks made by the district attorney, who was also prosecuting the case. Williams has not argued that the remarks made by the first district attorney were improper, and we find no error in referring to those remarks.
 

 F.
 
 Misrepresentation of the Law
 

 In arguing the weighing process the jury must undertake regarding aggravating and mitigating circumstances, the prosecutor stated:
 

 And if you find that the aggravating circumstances in this case tip the scale more, then the death penalty is an appropriate sentence.
 

 Williams argues that telling the jury that if it finds the aggravating circumstances outweigh the mitigating factors, then the death penalty is
 
 the
 
 appropriate penalty is blatant misconduct. Williams’ argument relies on Bennett v. State, 106 Nev. 135, 787 P.2d 797,
 
 cert. denied,
 
 498 U.S. 925 (1990), holding that such a finding merely opens the door for the jury to consider the death penalty as a
 
 possible
 
 sentencing option.
 

 The State argues that the prosecutor did not state that the death penalty was the jury’s only option. The prosecutor’s own words reveal that he stated that the death penalty was
 
 an
 
 appropriate sentence — not
 
 the
 
 appropriate sentence. But after a review of all the evidence, the prosecutor is permitted to argue that the only appropriate penalty is death. Domingues v. State, 112 Nev. 683, 698-99, 917 P.2d 1364, 1375 (1996). Therefore, we conclude that Williams’ argument lacks merit.
 

 G.
 
 Duty to Society at Large
 

 Williams argues that the prosecution committed misconduct by overshadowing the jury’s proper role and imposing an “ethereal duty involving society at large.” References to the jury acting as the conscience of the community and as having to be angry unto death with a defendant to qualify as a moral community have been identified as improper arguments amounting to prosecutorial misconduct. Haberstroh v. State, 105 Nev. 739, 782 P.2d 1343 (1989); Collier v. State, 101 Nev. 473, 705 P.2d 1126 (1985),
 
 cert. denied,
 
 486 U.S. 1036 (1988).
 

 Williams challenges the following statements by the prosecutor as being improper pleas regarding societal concerns. He contends
 
 *1023
 
 that the prosecutor’s remarks ask the jury to send a message to society at large, rather than determining the proper punishment for this defendant for committing this crime. The prosecutor stated:
 

 And then there is deterrence. What is the message that we are to send other individuals that prey on senior citizens? What is the message that we are to send to other Antoine Williams that are going to prey upon senior citizens because they are easy marks. By what happens here today sends a message to those other people. Deterrence is an important function in your decision in this case.
 

 And then finally the question becomes one of commitment. Each and every one of you came before the Court in jury selection, you said that if the circumstances were appropriate you would have to resolve the commitment, the determination to do your legal duty. I suggest to you that the evidence is compelling, the viciousness of this crime cries out for one punishment.
 

 The United States Supreme Court has held that it is permissible to argue in favor of the purposes of the death penalty, including the objectives of retribution and deterrence.
 
 See
 
 Gregg v. Georgia, 428 U.S. 153, 183-87 (1976) (opinion of Stewart, Powell, and Stevens, JJ.). This court has taken the same position that “the prosecutor may go beyond the evidence to discuss general theories of penology such as the merits of punishment, deterrence and the death penalty.” Witter v. State, 112 Nev. 908, 924, 921 P.2d 886, 897 (1996). In prior death penalty cases, we have permitted the prosecutor reasonable latitude in doing this.
 
 See
 
 Atkins v. State, 112 Nev. 1122, 923 P.2d 1119 (1996);
 
 Witter,
 
 112 Nev. 908, 921 P.2d at 886; Domingues v. State, 112 Nev. 683, 917 P.2d 1364 (1996). Therefore, the above argument was proper.
 

 We conclude that no prosecutorial error occurred in this trial as Williams claims and that the prosecutors’ remarks in no way deprived him of a fair hearing.
 

 Motion to argue last at the penalty hearing
 

 Williams contends that NRS 200.030(4)
 
 [7]
 
 shifts the burden of proof to the defendant to prove that mitigating circumstances outweigh aggravating circumstances. Citing Griffin v. Illinois,
 
 *1024
 
 351 U.S. 12, 28 (1956), Williams argues that those charged with capital offenses must be granted special consideration. He argues that the district court should have allowed him to argue last during the closing arguments of the penalty hearing. As the State points out, this court recently rejected this same contention in Witter v. State, 112 Nev. 908, 921 P.2d 886 (1996).
 
 [8]
 

 NRS 175.141
 
 [9]
 
 mandates that the State open and close the argument. The district court is bound by statute and does not have the authority to allow Williams to argue last.
 
 See Witter,
 
 112 Nev. at 923, 921 P.2d at 896. Therefore, we conclude that the district court did not err when it denied Williams’ request to argue last during the penalty phase.
 

 The death sentence was not imposed under the influence of passion, prejudice or any arbitrary factor
 

 Williams does not raise this issue on appeal, however NRS 177.055(2) requires this court to address it. We conclude that the record contains sufficient evidence for the panel to have found that the aggravating factors outweighed the mitigating circumstances, and thus rendered a death sentence without passion, prejudice or other arbitrary factor.
 

 CONCLUSION
 

 We conclude that the district court was within its discretion to admit Williams’ confession as well as the photographs of the crime scene into evidence. We also conclude that the district court provided the jury with adequate instructions regarding malice aforethought and premeditation/deliberation. We conclude that the district court properly denied Williams’ motion to empanel a new jury for sentencing and his motion to argue last at the penalty hearing. Finally, we conclude that no prosecutorial misconduct occurred. Therefore, we conclude that Williams’ arguments are without merit and affirm in all respects the judgment of convictions and the sentences imposed thereon.
 
 [10]
 

 [1]
 

 The officer testified that Williams asked either “What are the charges?” or “What am I charged for?”
 

 [2]
 

 NRS 48.035 states, in relevant part, that “although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury.”
 

 [3]
 

 The
 
 Briano
 
 standard states:
 

 In order to make a case of murder in the first degree, the state must prove that a design to kill was distinctly and rationally formed in the mind of the perpetrator, at or before the time that the fatal blows were
 
 *1017
 
 struck. The state need not prove motive. Nor does it matter how short a time existed between the formation of the design to kill and the killing itself.
 

 Briano,
 
 94 Nev. at 425, 581 P.2d at 7 (citations omitted).
 

 [4]
 

 NRS 175.556 provides, in relevant part:
 

 If a jury is unable to reach a unanimous verdict upon the sentence to be imposed, the supreme court shall appoint two district judges from judicial districts other than the district in which the plea is made, who shall with the district judge who conducted the trial, or his successor in office, conduct the required penalty hearing to determine the presence of aggravating and mitigating circumstances, and give sentence accordingly.
 

 [5]
 

 See, e.g.,
 
 Colwell v. State, 112 Nev. 807, 919 P.2d 403 (1996); Riker v. State, 111 Nev. 1316, 1326, 905 P.2d 706, 712 (1995),
 
 cert. denied,
 
 . U.S., 116 S. Ct. 1687 (1996); Paine v. State, 110 Nev. 609, 617-18, 877 P.2d 1025, 1030-31 (1994),
 
 cert. denied,
 
 514 U.S. 1038, 115 S. Ct. 1405 (1995).
 

 [6]
 

 See, e.g., Colwell,
 
 112 Nev. at 813-14, 919 P.2d at 407;
 
 Riker,
 
 111 Nev. at 1326, 905 P.2d at 712,
 
 cert, denied,
 
 . U.S., 116 S. Ct. 1687 (1996);
 
 Paine,
 
 110 Nev. at 617-18, 877 P.2d at 1030-31,
 
 cert. denied,
 
 514 U.S. 1038, 115 S. Ct. 1405 (1995); Beets v. State, 107 Nev. 957, 821 P.2d
 
 *1018
 
 1044,
 
 cert. denied,
 
 506 U.S. 838 (1991); McKenna v. State, 101 Nev. 338, 705 P.2d 614,
 
 cert. denied,
 
 474 U.S. 1093 (1986).
 

 [7]
 

 NRS 200.030(4) states, in relevant part, that a “person convicted of murder of the first degree . . . shall be punished: (a) By death, only if one or more aggravating circumstances are found and any mitigating circumstance or circumstances which are found do not outweigh the aggravating circumstance or circumstances.”
 

 [8]
 

 In
 
 Witter,
 
 112 Nev. at 923, 921 P.2d at 896, we stated:
 

 First, we read NRS 200.030(4) as stating that the death penalty is an available punishment only if the state can prove beyond a reasonable doubt at least one aggravating circumstance exists, and that the aggravating circumstance or circumstances outweigh the mitigating evidence offered by the defendant. The statute does not shift the burden of proof to the defendant.
 

 [9]
 

 NRS 175.141 states, in relevant part, that “when the evidence is concluded . . . the district attorney, or other counsel for the state, must open and must conclude the argument.”
 

 [10]
 

 The Honorable A. William Maupin, Justice, did not participate in the decision of this appeal.