JOHN OLIVER SNOW, Appellant, v. THE
STATE OF NEVADA, Respondent.

No. 15897

August 28, 1985                                    705 P.2d 632

*Joseph W. Houston, II,* Las Vegas, for Appellant.

*Brian McKay,* Attorney General, Carson City; *Robert Miller,* District Attorney, *James Tufteland,* Deputy District Attorney, and *Robert W. Teuton,* Deputy District Attorney, Clark County, for Respondent.

## OPINION

By the Court, MOWBRAY, J.:

A jury convicted appellant John Oliver Snow of conspiracy to commit murder and first degree murder with use of a deadly weapon for the shooting death of Harry Wham. At the penalty hearing, on the first degree murder conviction, the jury found the homicide was committed under three aggravating circumstances and no mitigating circumstances. The jury returned the penalty of death. On appeal, Snow raises several assignments of error, none of which is of sufficient merit to warrant reversal of the judgment of conviction or the sentence. Therefore, we affirm.

### THE FACTS

As the hired assassin in the conspiracy to kill Harry Wham, Snow was paid several thousand dollars by the principal members of the conspiracy: Peggy Wham, Harry's wife, and her lover, Joseph Douglas Parker (Doug Parker). Also involved were Kathy Faltinowski, Peggy's daughter and Harry's step-daughter, and John David Parker (John Parker), Kathy's lover and the brother of Doug.[1]

The conspiracy to kill Harry Wham began in the fall of 1982. Kathy Faltinowski testified that she overheard a conversation between Doug Parker and her mother in late November during which Peggy Wham said she wanted her husband killed. Sally Cook, Peggy's sister, testified that Doug Parker told her that he, John Parker and Peggy were going to have Harry Wham killed by hiring someone from back east. This conversation took place between Christmas and New Year's 1982. At that time, Snow shared an apartment at 801 Elizabeth, in Newark, New Jersey, with his common-law wife, Ingrid Smith.

In early January 1983, Kathy Faltinowski drove with John and Doug Parker to Los Angeles and picked up John Biancone at the airport. Biancone also lived in New Jersey. Kathy overheard Doug ask Biancone to murder Harry Wham. Biancone agreed to commit the crime for $5,000 in advance and $5,000 after the

---

[1]Peggy Wham was convicted of conspiracy to commit murder, attempted murder with use of a deadly weapon, and first degree murder with use of a deadly weapon. On the last count, Peggy was sentenced to two consecutive sentences of life without parole. Peggy's appeal, No. 15427, is pending before this Court. Doug Parker pleaded guilty to first degree murder with use of a deadly weapon. He was sentenced to two consecutive sentences of life with the possibility of parole. Kathy Faltinowski pleaded guilty to second degree murder and was sentenced to life with the possibility of parole in five years. John Parker pleaded guilty to first degree murder with use of a deadly weapon. John Parker was sentenced to life with the possibility of parole.

murder was completed. Peggy Wham gave Kathy Faltinowski $5,000 to give to Doug. Peggy said she had stolen the money from the safe at the Keyboard Lounge which she owned with Harry Wham. Biancone then left Las Vegas. About one week before January 26, 1983, Kathy Faltinowski saw Biancone who is white, with Snow, who is black, in Las Vegas.

On January 26, 1983, Harry Wham was shot in what appeared to be a robbery. Harry told police that he parked his pick-up on the street near his town house around 11:00 p.m. A black man got out of the passenger side of a nearby car and demanded that Harry get out of his truck, hand over his money, and turn around. Harry thought he saw a white male on the driver's side. The black man then shot Harry in the neck. Harry was injured but spent only twenty-four hours in the hospital. Harry remarked at the time that he did not believe it was a genuine robbery. After the shooting, Doug Parker told Kathy Faltinowski and John Parker that Biancone drove the car the night of January 26 and that Snow shot Harry Wham in the back of the head.

Between January 26 and February 13, 1983, John Parker and Doug Parker told Kathy Faltinowski that Snow and Biancone[2] were going to come back and finish the job. During this same period, Sally Cook heard John and Doug talking about how "the man" was impatient and wanted to finish the job. John then said he would call the man and took out a slip of paper that had the words "John Snow" and "New Jersey" written on it, as well as an address or a phone number.

A few days before February 13, 1983, Peggy Wham gave John Parker the key to the Wham garage. When Kathy Faltinowski was present, John and Peggy cleaned out the garage and arranged boxes at the side to form a hiding place. Arlen Edwards, Harry Wham's next door neighbor, testified about the existence of the hiding place immediately after Harry Wham was murdered in the garage.

At 1:30 p.m. on February 13, 1983, Kathy Faltinowski and John Parker drove to the Golden City Motel to pick up Snow. He came out of Room 106. Snow was wearing a dark pinstripe suit. He had a revolver with a silencer on it. The three drove to Peggy and Harry Wham's town house on Pecos Way in Las Vegas. John unlocked the Whams' garage door using the key given him by Peggy. Snow put on rubber gloves and hid behind the boxes. John and Kathy Faltinowski left the Whams around 2:00 p.m.

Arlen and Jody Edwards lived in the town house next door to the Whams. At 4:20 p.m. on February 13, 1983, Arlen and Jody walked out of their house and into their garage. They both heard

---

[2]The record does not reveal whether Biancone was ever arrested or charged for his participation in the conspiracy to kill Harry Wham.

"popping" noises and then saw a black man in a dark suit run from the Wham garage. Arlen saw only part of the man's face and could not identify Snow as that man. Arlen chased the man and lost sight of him as he ran across a desert area toward the Wagon Wheel Apartments on Pecos Road. Kathy Faltinowski lived in the Wagon Wheel Apartments about four blocks from the Wham town house.

At Snow's trial, Jody Edwards testified that she saw all of the black man's face as he paused just outside the Whams' garage. She identified Snow as that man in court. Jody admitted that she testified at the previous trial of Peggy Wham that she could not identify the man who ran from the garage. Jody testified that she had lied before because she had been threatened by Peggy and by Kathy Faltinowski.

Immediately after the shooting on February 13, 1983, Arlen Edwards found Harry Wham sitting in his car bleeding heavily. Harry died before the paramedics arrived. His death was due to multiple gunshot wounds in the face and head.

Around 4:30 p.m., on February 13, 1983, John Parker and Kathy Faltinowski were driving down Pecos Road. They saw Snow running towards Kathy's apartment. They returned to the apartment joining Sally Cook who was also there. Sally testified that a few minutes later a black man in a dark suit burst in demanding a ride. John asked Sally to give the black man, whom he called John Snow, a ride. Sally refused. Kathy Faltinowski drove Snow back to the Golden City Motel. During the drive, Snow told Kathy that he had just shot her stepfather.

On February 16, 1983, Sally Cook spoke with a friend about the Wham murder. The friend, Richard Hansen, advised her to go to the police but Sally would not. Hansen reported this to the police. Hansen agreed to wear a microphone and transmitting device when he next spoke with Sally. The police taped a subsequent conversation between him and Sally. As a result of this conversation, the police arrested Peggy Wham, Kathy Faltinowski, John and Doug Parker on the afternoon of February 17, 1983.

In the morning of February 17, 1983, Doug Parker told Sally Cook that he had just given the hit man $7,000 and that the hit man was on his way to San Francisco. Snow himself testified that he flew from Las Vegas to San Francisco on that date. From a pay phone at the San Francisco airport, a call was made just after twelve noon that day to the home of the parents of the Parker brothers. The call was charged to the telephone at 801 Elizabeth, Snow's apartment in Newark, New Jersey. The mother of Doug and John Parker testified that she answered the telephone in her home in the early afternoon of February 17, 1983. The caller left a message asking Doug to get in touch with Johnny. Another call

shortly after the first was placed from the same pay phone at the San Francisco airport and was charged to the same number in New Jersey. This call was made to a friend of Snow's, Olivia Burnett, living in Fairfield, California. Burnett testified that Snow called her that day to come pick him up at the airport.

Police investigators obtained additional information from Sally Cook which lead to Snow being indicted for Harry Wham's murder. A warrant for Snow's arrest was issued and programmed into the National Crime Information computer. On March 4, 1983, Snow was arraigned in Superior Court in New Jersey on unrelated charges. He was fingerprinted. Snow's fingerprints called up the Nevada arrest warrant from the computer. As a result, Snow was arrested and booked for the murder of Harry Wham.

Snow denied knowing either Doug or John Parker. In his wallet when Snow was arrested was a piece of paper with "Doug" on it and the telephone number of the home of the Parkers' parents. Snow also told police that the last time he had been in Las Vegas was in 1966 or 1967. At trial, evidence was introduced that Snow's fingerprint had been found in Room 106 at the Golden City Motel on February 17, 1983. Witnesses from the motel identified Snow as the man who stayed in Room 106 for several days in February 1983.

Snow was charged with conspiracy to commit murder, first degree murder with use of a deadly weapon and attempted murder. He was convicted of conspiracy to commit murder and first degree murder with use of a deadly weapon. At the penalty hearing on the first degree murder conviction, the State produced evidence that Snow pleaded guilty in 1962 to robbing three victims in separate incidents. Following the penalty hearing, the jury returned a verdict finding three aggravating circumstances: that the murder was committed by a person previously convicted of a crime involving the use or threat of violence; that the murder was committed during the commission or attempt of a burglary; that the murder was committed for the purpose of receiving money or other things of monetary value. The jury found no mitigating circumstances and sentenced Snow to death. Snow appeals from the judgment of conviction and the death sentence.

## THE LAW

1. Snow argues that the district court erred in denying his pretrial petition for a writ of habeas corpus. Snow alleged that there was insufficient evidence before the grand jury for it to find probable cause to indict him. Immediate appeal from a denial of a pretrial petition for habeas corpus is precluded by NRS 34.380.

Gary v. Sheriff, 96 Nev. 78, 605 P.2d 212 (1980). Assuming, without deciding, that a convicted defendant may challenge on appeal a denial of a pretrial petition for habeas corpus predicated upon lack of probable cause to indict, we hold that in the case at bar there was sufficient evidence from which the grand jury could find probable cause.

The following evidence was presented to the grand jury concerning the identity of Harry Wham's murderer: Sally Cook testified that Doug and John Parker referred to the person that they had hired to kill Harry Wham as John or Johnny Snow of New Jersey on two occasions before the murder. Arlen Edwards testified that he saw a black man wearing a dark suit run from the Whams' garage after he had heard shots fired at 4:25 p.m. on February 13, 1983. Sally was in Kathy Faltinowski's apartment, four blocks from the Whams' town house, that day. Sally also testified that at 4:30 p.m. a black man in a dark suit burst into the apartment. John asked Sally to give the man, whom he called John Snow, a ride, but Sally refused. Detective Robert Allen testified that he determined that the killer was John Oliver Snow of Newark, New Jersey. Snow argues that this evidence is insufficient because no witness before the grand jury identified his photograph as the John Snow to which they were referring and because Detective Allen did not give the factual basis for his conclusion that appellant was the same John Snow. Only probable cause of identity is required when testing the sufficiency of an indictment. Burton v. Sheriff, 93 Nev. 346, 565 P.2d 1010 (1977). The *Burton* court specifically held that "identity of name is sufficient to prove identity of person in the absence of contradictory evidence." 93 Nev. at 347. We hold that the district court did not err in denying Snow's petition for habeas corpus.

2. Snow suggests that prospective juror Thornton was improperly excluded for cause due to his views on the death penalty. *See* Witherspoon v. Illinois, 391 U.S. 510 (1968). We disagree. From our review of the record, we conclude that prospective juror Thornton indicated that his views on the death penalty "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath'." Wainwright v. Witt, ...... U.S. ......, 105 S.Ct. 844, 853 (1985) (quoting Adams v. Texas, 448 U.S. 38, 45 (1980)). Therefore, prospective juror Thornton was properly excluded for cause. *Wainwright v. Witt, supra.*

3. Next, Snow contends that two jurors, Lorraine Van Com-

pernolle and Dorothy Hansen, should have been excluded for cause under NRS 16.050(1)(f).[3] That statute provides that a juror may be challenged for cause if he or she has "formed or expressed unqualified opinion as to the merits of the action." Both juror Van Compernolle and juror Hansen indicated that they had previously formed an opinion on appellant's guilt from their exposure to news media accounts of the crime. Neither juror represented that their opinion was "unqualified." Instead, both stated that they would set aside their previous opinions and would be able to keep an open mind as to appellant's guilt until a verdict was reached. Therefore, the district court did not err in refusing to exclude these two jurors. Kaplan v. State, 96 Nev. 798, 800, 618 P.2d 354, 355-56 (1980).

4. Snow also contends that certain evidence was improperly admitted at trial. Snow challenges the admission of billing records of Centel Telephone in Las Vegas and of New Jersey Bell. A custodian of records from the respective Companies testified concerning how these records were kept. We hold that a proper foundation was laid and these records were correctly admitted under the business records exception to the hearsay rule. NRS 51.135(1).[4] Snow also objected to the admission of the contents of his wallet, including a piece of paper with "Doug" on it and the telephone number of the parents of John and Doug Parker. We hold that the contents of Snow's wallet were admissible as evidence seized during a search following a valid arrest. Hinton v. State, 84 Nev. 68, 436 P.2d 223 (1968).

5. Snow suggests that the prosecutor committed misconduct during closing argument in both the guilt and the penalty phases.

---

[3]NRS 16.050(1) provides:

Challenges for cause may be taken on one or more of the following grounds:

\* \* \* \* \*

(f) Having formed or expressed an unqualified opinion or belief as to the merits of the action, or the main question involved therein; but the reading of newspaper accounts of the subject matter before the court shall not disqualify a juror either for bias or opinion.

[4]NRS 51.135(1) provides:

A memorandum, report, record or data compilation, in any form, of acts, events, conditions, opinions or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, all in the course of a regularly conducted activity, as shown by the testimony of the custodian or other qualified witness, is not inadmissible under the hearsay rule unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

We have considered each assignment of error and have concluded that none is of sufficient merit to warrant reversal.

At one point during argument in the guilt phase, the prosecutor stated that Jody Edwards had identified Snow in a photographic line-up. Jody identified Snow in open court. She had been unable to select his photograph from a group shown her by the police shortly after the murder.[5] The prosecutor's statement misrepresented the facts in evidence. There was no indication that the misrepresentation was intentional. Snow contends that Jody's identification testimony was crucial to the State's case against him.[6] Therefore, he argues that his conviction must be reversed because of the inadvertent misrepresentation. We note that the defense did not object to the comment. We are not obligated to consider issues which have not been preserved for appeal. Mercado v. State, 100 Nev. 535, 688 P.2d 305 (1984). "We cannot conclude that the jury's deliberations were tainted because of one remark, the prejudicial effect of which could have been cured had an objection been raised at trial." *Mercado*, 100 Nev. at 539.

During closing argument in the guilt phase, the prosecutor referred to the jurors as representatives of the "community" and the "state." Snow did not object to the former comment. Therefore, we need not address that claim of error. *Mercado, supra.* Snow objected to the latter remark. We hold that any error was cured by the trial court's admonishment to the jury to disregard the statement. Stickney v. State, 93 Nev. 285, 564 P.2d 604 (1977).

Snow also challenges the prosecutor's use of the word "we" during argument at the penalty hearing. For the most part, the prosecutor used "we" as a rhetorical device which was not improper. Once, however, the word "we" was used in a manner that suggested that the jury was aligned with the prosecution in determining Snow's punishment.[7] Of course, this is not the case.

---

[5]There was no evidence on the results of the Photographic line-up shown Jody by defense investigators just before trial.

[6]Snow's counsel argued repeatedly in closing argument that without Jody Edwards' identification testimony the State had no case against his client. In response, the prosecutor remarked, "Well, Mr. Houston, if you really believe that, why did you argue for forty minutes?" Snow claims that this was an impermissible comment on legitimate defense tactics. We disagree. Further, any error was harmless beyond a reasonable doubt due to the overwhelming evidence of Snow's guilt. Talancon v. State, 97 Nev. 12, 621 P.2d 1111 (1981).

[7]The prosecutor stated, "We try to decide what punishment fits the crime and then we try to decide if what we do here today, if the message we send

The district court corrected any misimpression by remarking, "I think the word 'we' might be misunderstood. It is obvious that the jury would act and their decision would be on their own and not part of the prosecution's or defense's." Any error was cured by the admonishment. *Stickney, supra.*

6. Finally, Snow argues that NRS 200.030(4)[8] is unconstitutionally vague because it places the burden on the accused to prove that mitigating circumstances outweigh the aggravating circumstances in his case in order to avoid the imposition of the death penalty. This Court recently considered and rejected this argument in Ybarra v. State, 100 Nev. 167, 679 P.2d 797 (1984). Therefore, Snow's contention is without merit. We also reject his claim that it is improper to allow the state to open and close argument at the penalty hearing.

7. Under NRS 177.055(2)(d), this Court must review a death sentence and determine whether it is disproportionate to the penalty imposed in similar cases in this state.[9] We conclude, after analyzing the circumstances of Snow's crime, that the sentence of death is not disproportionate to the penalty imposed in similar cases. *See* Nevius v. State, 101 Nev. 238, 699 P.2d 1053 (1985); Petrocelli v. State, 101 Nev. 46, 692 P.2d 503 (1985); Deutscher v. State, 95 Nev. 669, 601 P.2d 407 (1979). We have also conducted the separate "arbitrariness review" required by NRS 177.055(2)(c), and have determined that the death penalty in this

---

out to the community and to other would-be contract killers . . .". At this point, defense counsel objected. On appeal, Snow also claims that references to the deterrent effect of Snow's sentence on persons who might contemplate contract killings in the future was error. We agree with the finding of the district court that the comments were within the bounds of permissible argument.

[8]NRS 200.030(4) provides:

Every person convicted of murder of the first degree shall be punished:

(a) By death, only if one or more aggravating circumstances are found and any mitigating circumstance or circumstances which are found do not outweigh the aggravating circumstance or circumstances.

(b) Otherwise, by imprisonment in the state prison for life with or without possibility of parole. If the penalty is fixed at life imprisonment with possibility of parole, eligibility for parole begins when a minimum of 10 years has been served.

[9]NRS 177.055(2)(d) was recently amended to abolish the proportionality review requirement. This amendment became effective June 6, 1985. 1985 Stats. ch. 527 § 1, at 1597-1598. The prohibition against ex post facto laws requires that we apply the law as it existed when the crime was committed. *See* Goldsworthy v. Hannifin, 86 Nev. 252, 468 P.2d 350 (1970). Therefore, we must conduct a proportionality review of appellant's sentence.

case was not imposed under passion, prejudice or any arbitrary factor.

## CONCLUSION

We hold that all the errors raised by appellant and enumerated on appeal are without merit. We conclude that the death penalty in this case is not disproportionate. Accordingly, we affirm the judgment of conviction and the sentence of death.

SPRINGER, C. J., and GUNDERSON, STEFFEN, and YOUNG, JJ., concur.