966 P.2d 735 (1998)
William Christopher SCHOELS, Appellant,
v.
The STATE of Nevada, Respondent.
No. 28086.
Supreme Court of Nevada.
October 27, 1998.
*736 Morgan D. Harris, Public Defender, Michael L. Miller and Howard Brooks, Deputy Public Defenders, Clark County, for appellant.
*737 Frankie Sue Del Papa, Attorney General, Carson City Stewart L. Bell, District Attorney and James Tufteland, Chief Deputy District Attorney, Clark County, for respondent.

OPINION
ROSE, Justice.
William Christopher Schoels and Gregory Hayes were playing basketball at a sports complex in Las Vegas when they engaged in an argument. Schoels announced that he was going to leave and began walking toward the opposite end of the basketball court. According to witnesses, Hayes followed Schoels, "talking trash," and threatening to return with a gun. Schoels then pulled a gun and shot Hayes in the right shoulder. Hayes fell forward, grabbing Schoels around the legs, and Schoels then shot him in the back, killing him.
Schoels was arrested, and a jury convicted him of first-degree murder with the use of a deadly weapon and possession of a firearm by an ex-felon. Schoels was sentenced to life in prison without the possibility of parole for the murder conviction, life without the possibility of parole for use of a deadly weapon, and six years in prison for the possession of a firearm by an ex-felon.
Schoels now appeals his convictions and sentences, arguing that the district court abused its discretion and committed reversible error both in the guilt and penalty phases of his trial.

Denial of Plea Change
On October 19, 1993, Schoels pleaded not guilty to the charge of ex-felon in possession of a firearm. Twenty-three months later, just before jury selection and after both parties had prepared their cases for trial, Schoels petitioned the court to change his plea on that charge. The district court denied the request, stating that allowance of the change at such a late point in the proceedings would be "highly detrimental to the State."
Schoels argues that the district court's denial of this request contaminated the jury and denied him a fair trial. He argues that a plea of guilty would have allowed the jury to deliberate the degree of the alleged homicide without being influenced by knowledge of his ex-felon status.
"[A]ccepting a tendered plea of guilty is within the sound discretion of the trial court." Sturrock v. State, 95 Nev. 938, 940, 604 P.2d 341, 343 (1979) (footnote omitted); NRS 174.035(1).[1] A defendant does not have a right to have his guilty plea accepted. North Carolina v. Alford, 400 U.S. 25, 38 n. 11, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970); Jefferson v. State, 108 Nev. 953, 954, 840 P.2d 1234, 1235 (1992). A trial judge has authority to assure protection of public interests including assuring fairness to the prosecution. Sparks v. State, 104 Nev. 316, 759 P.2d 180 (1988).
NRS 174.035(1) provided the district court the discretion to deny Schoels' plea. Because the trial court has discretion to decline to accept a plea change when necessary to protect the public interest, we hold that the district court did not abuse its discretion by denying Schoels' guilty plea.

Jury Instructions
Schoels argues that the district court improperly instructed the jury regarding the elements of first-degree murder, the elements of voluntary manslaughter and the applicability of self-defense to the charges.
Schoels concludes that the district court failed to instruct the jury that first-degree murder must be "willful, deliberate and premeditated." See NRS 200.030. Schoels contends that the district court, by defining only "premeditation" and by failing to define "willful" and "deliberate," rendered NRS 200.030 meaningless and blurred the distinction between first and second-degree murder. Schoels further contends that the district court misled the jury when it defined *738 premeditation as "instantaneous as successive thoughts of the mind."[2]
It is not necessary to offer discrete definitions of deliberateness or willfulness so long as the jury instruction on premeditation is proper. See Powell v. State, 108 Nev. 700, 709-10, 838 P.2d 921, 927 (1992), vacated on other grounds, 511 U.S. 79, 114 S.Ct. 1280, 128 L.Ed.2d 1 (1994) see also Doyle v. State, 112 Nev. 879, 921 P.2d 901 (1996) Witter v. State, 112 Nev. 908, 921 P.2d 886 (1996); DePasquale v. State, 106 Nev. 843, 803 P.2d 218 (1990), cert. denied, 502 U.S. 829, 112 S.Ct. 99, 116 L.Ed.2d 70 (1991) (using premeditated and deliberate as a single term); Briano v. State, 94 Nev. 422, 581 P.2d 5 (1978) (same). Premeditation requires the state to "prove that a design to kill was distinctly and rationally formed in the mind of the perpetrator, at or before the time the fatal blows were struck .... [regardless of] how short a time existed between the formation of the design to kill and the killing itself." Briano, 94 Nev. at 425, 581 P.2d at 7 (citations omitted).
In Powell, this court examined an instruction identical to the instruction challenged by Schoels and held that it was a proper definition of premeditation. Id., 108 Nev. at 710, 838 P.2d at 927. Accordingly, we hold that the district court did not err by failing to define willfulness or deliberateness.
Schoels also contends that the district court erred by failing to include his proposed language in the jury instruction regarding voluntary manslaughter.[3] At trial, Schoels argued that the victim's threat of physical violence to Schoels was sufficient provocation to justify a finding of voluntary manslaughter. The defense proposed the following addition to the instruction: "The serious and highly provoking injury which causes the sudden heat of passion for purposes of voluntary manslaughter can occur without direct physical contact." The proposed language is consistent with Nevada law. See Roberts v. State, 102 Nev. 170, 717 P.2d 1115 (1986) (a serious and highly provoking injury need not be a direct physical assault on the victim). The State argues that the reference to attempt in the jury instruction[4] sufficiently conveys that no direct physical assault is necessary to provoke manslaughter, and that the proposed language was therefore superfluous.
We conclude that the jury instruction failed to convey unambiguously that a direct physical assault by the victim was unnecessary. However, it seems obvious that had the jury received a proper instruction, it would not have reached a different conclusion at trial. Horvath v. Burt, 98 Nev. 186, 643 P.2d 1229 (1982) (reversal is not required unless a different result would be likely absent the contested instruction). Therefore, we conclude that Schoels' argument lacks merit.
Schoels next contends that the district court improperly instructed the jury *739 regarding self-defense.[5] Schoels argues that the language "actual danger is not necessary to justify self defense" should have been added to the instruction and was necessary to his defense. An instruction that a defendant may only use self-defense to justify a homicide when he is in actual danger of being killed or seriously injured by his assailant is improper. Culverson v. State, 106 Nev. 484, 797 P.2d 238 (1990). Schoels contends that the court's refusal to include his proposed language resulted in an unfair trial.
The State argues that the language in the jury instruction, stating that "the right of self defense upon such appearances and from such fear and honest convictions ... is the same whether such danger is real or merely apparent," explained that apparent danger justifies self-defense as much as actual danger. We agree, and conclude that Schoels' challenge of the jury instruction plainly lacks merit.

Prosecutorial Misconduct
Schoels claims that the prosecution engaged in several forms of misconduct at trial. He argues that the prosecution made statements that referred to the jury as the conscience of the community or sought to align the jury with the prosecution, and inappropriately forecast his future dangerousness.
Schoels' first allegation of misconduct is that the prosecutor improperly referred to the jury as "the conscience of the community," violating the well-established prohibition against such tactics. See Haberstroh v. State, 105 Nev. 739, 782 P.2d 1343 (1989), cert. denied, 510 U.S. 858, 114 S.Ct. 169, 126 L.Ed.2d 129 (1993); see also Snow v. State, 101 Nev. 439, 705 P.2d 632 (1985), cert. denied, 475 U.S. 1031, 106 S.Ct. 1238, 89 L.Ed.2d 346 (1986). However, in first degree murder cases where the jury is to consider the sentence to be imposed, we have previously held that it was not reversible error for a prosecutor to argue community standards to assist the jury in imposing the punishment. See Lisle v. State, 113 Nev. 540, 937 P.2d 473 (1997); Domingues v. State, 112 Nev. 683, 917 P.2d 1364 (1996). Upon consideration of the numerous instances cited by Schoels, we conclude that the prosecution made no improper argument and that Schoels' claim of error on this ground is therefore meritless.
Schoels' second allegation of misconduct is that the prosecution improperly used collective terms such as "we", "us" and "our" in its closing argument.[6] It is improper for the State to argue in a fashion that suggests the jury should align itself with the prosecution. Snow, 101 Nev. at 447, 705 P.2d at 639.
The State argues that it did not use the words "we", "us", and "our" to align the jury with the prosecution. Collective pronouns such as "we" and "our" are appropriate if they are used to indicate citizens or human beings rather than to align the prosecution with the jury in determining a defendant's punishment. Id. at 447, 705 P.2d at 639. We conclude that the prosecution's use of "we", "us" and "our" did not constitute prosecutorial misconduct.
Schoels' third allegation of misconduct involves the prosecution's prediction of his future dangerousness as a basis for imposition of the death penalty. The prosecution argued to the jury, over Schoels' objection, that it was necessary to put Schoels to death in order to prevent him from killing others in the future, thereby saving innocent victims from the murderous hands of William Schoels. The way to protect innocent victims of homicide in the future, according to the *740 prosecutor, was for the jurors to vote for the death penalty so that "no one else has to die at his hands."
In this case, Schoels carried a pistol in his pocket while playing basketball in the gym. When a heated argument with the victim developed, Schoels pulled out his pistol and shot the unarmed man at point blank range in the shoulder and then in the back.[7] The jury was also informed that Schoels had been convicted of armed robbery a few years earlier. Under these circumstances, it was proper for the prosecution to argue the future dangerousness of Schoels.[8] However, the argument on future dangerousness below suggested, at least by strong implication, that the jury would be responsible for the deaths of future innocent victims if a death penalty verdict was not returned. A prosecutor may not argue or suggest to the jury that the jury is or would be responsible for any future victims of the defendant. We disapproved of this type of comment in Howard v. State, 106 Nev. 713, 718-719, 800 P.2d 175, 178 (1990), and more recently in Castillo v. State, 114 Nev. 271, ___, 956 P.2d 103, 109 (1998). A prosecutor may not argue that the jury, by its verdict, will be choosing whether to execute the defendant or some innocent victim in the future. This prohibition includes the argument that it is necessary to execute the defendant to protect innocent victims from death at the defendant's hands in the future. A prosecutor may still argue that the defendant, if not executed, will pose a threat to the lives of others in the future or that he will kill again. What are prohibited are arguments which, directly or by implication, place responsibility on the jury for the deaths of unknown future victims. As we have held in the past, this type of prosecutorial misconduct is subject to harmless error analysis. However, we will reverse the conviction or death penalty where the decision between life or death is a close one or the prosecution's case is weak. See Jones v. State, 113 Nev. 454, 469-470, 937 P.2d 55, 65 (1997) To the extent that any of our previous cases discussing this issue may be read as inconsistent with this analysis, they are superseded.
Following this analysis, the prosecutor's argument was improper when he stated that it was necessary to execute Schoels to protect future victims. However, it was only stated once, the remaining argument was proper, and Schoels was not assessed the death penalty. Given the sufficient evidence supporting the verdict returned by the jury and the fact that the prosecutor made but one transgression in his closing argument, we deem this error harmless.

Penalty Phase Prejudice
Prior to trial, the district court denied Schoels' motion to argue last during the penalty phase. Schoels contends that it is fundamentally unfair to deny a person facing the death penalty the last chance to plead for his life. Schoels notes that NRS 200.030(4)(a) and NRS 175.554(3) place the burden on the defendant to prove that mitigating circumstances outweigh aggravating circumstances to avoid the death penalty, and argues that this burden should result in the defendant being allowed to argue last during the penalty phase.[9] *741 NRS 175.141(5) sets forth the procedure to follow during a trial. We concur with the State's argument that, because the penalty hearing is part of the trial, NRS 175.141(5) governs the penalty hearing as well. NRS 175.141(5) states that "the district attorney, or other counsel for the State, must open and conclude the argument." (Emphasis added.) Thus, NRS 175.141(5) mandates that the State argue last during the penalty phase where the death penalty is involved. See Witter v. State, 112 Nev. 908, 921 P.2d 886 (1996), cert. denied, ___ U.S. ___, 117 S.Ct. 1708, 137 L.Ed.2d 832 (1997). Accordingly, we conclude that Schoels' argument lacks merit.
Schoels further contends that the district court erred by permitting the prosecution to allege, without probable cause, aggravating factors and by "death qualifying" the jury, thereby tainting his due process right to a fair trial. Schoels argues that evidence of aggravating factors should be presented before a neutral magistrate to determine whether there is probable cause for death qualification of jurors. However, Schoels offers no authority in support of his proposal. Accordingly, we decline consideration of his argument. Cunningham v. State, 94 Nev. 128, 575 P.2d 936 (1978) (this court will not consider an issue if no relevant authority is presented on appeal).
Schoels also argues that the district court erred by accepting the prosecution's notice of intent to seek the death penalty based on aggravating factors which should not have been considered. Further, Schoels challenges the State's allegation of an aggravating circumstance based on a great risk of death to more than one person. See NRS 200.033(3). We recently held in Phenix v. State, 114 Nev. 116, 954 P.2d 739 (1998) that an appellant could not challenge jury instructions on aggravating circumstances where he had not received a death sentence below. In applying the same reasoning to the instant case, we decline to reach the merits of Schoels' arguments pertaining to the aggravating circumstances because he was not sentenced to death.
We have reviewed all of the other arguments and issues raised by the parties and conclude that they are without merit. We affirm the judgment of conviction and the sentence imposed.
YOUNG and MAUPIN, JJ., concur.
SHEARING, Justice, concurring.
I agree with the majority that Schoels' judgment of conviction should be affirmed. I write separately to address the allegations in the dissenting opinion.
There is no evidence for the dissenting justice's allegation that "prosecutors have, nonetheless, adopted the common practice of seeking the death penalty, not because they believe the case is truly a capital case but because they believe that seeking the death penalty will give them a tactical advantage." Obviously, the dissenting justice views the case differently than either the prosecution or, apparently, the jury in this case. This court's review of cases is limited to the evidence in the record. There is no evidence that the prosecutor applied an inappropriate standard in this case. The fact that the Nevada Supreme Court Task Force for the Study of Racial and Economic Bias in the Justice System recommended use of statewide standards for prosecutors' decisions regarding whether to seek the death penalty does not imply that inappropriate standards were used in this case.
I agree that the race of the defendant and the victim should not play any role in determining whether the death penalty should be sought. I also agree that some of the findings of the Task Force were disturbing, and every effort should be made to eliminate racial bias wherever it may exist in our system of justice. However, it is very important to both defendants and our society that each individual case be decided on the evidence in that case. The philosophy and experience of a reviewing justice may influence a ruling, but the decision must always be based on the evidence in the record.
Furthermore, this court must respect the doctrine of separation of powers. The judiciary may not invade the legitimate function of the prosecutor. Charging decisions are primarily a matter of discretion for the prosecution, *742 which represents the executive branch of government. Bordenkircher v. Hayes, 434 U.S. 357, 364, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978). In United States v. Cox, 342 F.2d 167, 171 (5th Cir.), cert. denied, 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700 (1965), the court stated:
It follows, as an incident of the constitutional separation of powers, that the courts are not to interfere with the free exercise of the discretionary powers of the attorneys of the United States in their control over criminal prosecutions.
Article 3, section 1 of the Constitution of the State of Nevada also provides for similar separation of powers.
The applicable principles are elaborated in United States v. Miller, 722 F.2d 562, 565 (9th Cir.1983) as follows:
[S]eparation of powers requires that the judiciary remain independent of executive affairs. Charging decisions are generally within the prosecutor's exclusive domain. Prosecutorsrepresentatives of the executive branch of the governmentare not mere servants of the judiciary. The tradition of prosecutorial independence is recognized both by case law, and the Federal Rules of Criminal Procedure.
... Generally, courts should be wary of second-guessing prosecutorial choices. Courts do not know which charges are best initiated at which time, which allocation of prosecutorial resources is most efficient, or the relative strengths of various cases and charges. Categorical limitations on charge bargains may force prosecutors to bring charges they ordinarily would not, or to maintain charges they would ordinarily dismiss as on-going investigations uncover more information.
(Citations omitted.)
Certainly it is the duty of the courts to enforce the due process limitations on arbitrary or discriminatory prosecution. The community benefits if standards for prosecutorial discretion are adopted and followed to protect against abuse of discretion and disparate treatment of minorities or the less powerful. However, judicial intervention should be confined to review of the records that are brought before the courts.
SPRINGER, Chief Justice, dissenting.
I dissent because I believe that Schoels did not get a fair trial and because I disapprove of what I see as being unfair and improper prosecutorial tactics employed by the State's attorneys in this case. I would reverse the judgment of conviction and the sentence of life without the possibility of parole.
The main point that I raise was not raised by Schoels in his appellate briefing. I raise it on my own. As a consequence, the State's attorneys have not had an opportunity to present counter arguments to the position that I forward in this dissenting opinion. I am, therefore, cautious not to be critical or lay blame on prosecutors who appear to be employing these objectionable practices. I am satisfied, nonetheless, that it is crucial to the administration of the criminal justice system in this state that the subject at hand be brought to the immediate attention of the bench and the bar.
This is the objectionable prosecutorial practice that I see being employed in this case and in other murder cases on a fairly regular basis: In murder cases that do not call for the death penalty under the standards of this court and the United State Supreme Court, prosecutors have, nonetheless, adopted the common practice of seeking the death penalty, not because they believe the case is truly a capital case but because they believe that seeking the death penalty will give them a tactical advantage. This practice gives prosecutors an advantage in the plea bargaining process and, if the accused goes to trial, results in an increased likelihood that the jury will return, by way of compromise, the next most severe verdict, life without the possibility of parole. A prosecutor who would knowingly overcharge in this manner is not only violating his oath by prosecuting in bad faith, such a prosecutor is risking the undeserved death of the accused if the jury were to "buy" the prosecutor's affected death penalty argument.[1]
*743 In order to make a non-capital case look like a capital case, prosecutors often try to make a procrustean fit of "aggravating circumstances" into a fact pattern that cannot suitably conform to any notion of that term as it is defined in our law. A good example of this agonizing process is found in the present case, in which the prosecutor tried to fit a simple, close-range shooting, involving two mutual combatants, into the statutory aggravating circumstance, "knowingly created a risk of death to more than one person." Schoels was involved in a life-or-death fight after his assailant "grabb[ed] Schoels around the legs," after which Schoels fired, point blank, into the body of his assailant. There is nothing at all in this case to suggest that in doing this he was "knowingly" or otherwise risking the life of other persons. (Unless of course, we were to say that he should have been able to know that a bullet might enter his adversary's body, exit the body and then find its way to some bystander).[2] The jury found that this was not a death penalty case, and it should have been readily apparent to the prosecution that this was not a death penalty case.
Prosecutors have certain duties that go beyond those normally imposed on private counsel. "An accused, whether guilty or innocent, is entitled to a fair trial, and it is the duty of the court and prosecutor to see that he gets it." Garner v. State, 78 Nev. 366, 373, 374 P.2d 525, 529 (1962) (citation omitted) (emphasis added). An elaboration of the prosecutor's special duty was furnished by the United States Supreme Court in Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1934). This reasoning was relied *744 upon in Garner, and warrants our consideration in the present case:
The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor.... But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.
Berger, 295 U.S. at 88, 55 S.Ct. 629 (emphasis added).
I see Schoels' conviction and sentence as being "wrongful." I would reverse the conviction because Schoels did not get a fair trial. Schoels was put in unwarranted jeopardy of death by being overcharged. He was charged with capital murder, it appears to me, solely to give the prosecution an unfair advantage and to increase the chances of the jury's bringing in a life without possibility of parole verdict. Now, I suppose it can be argued that sending this teen-aged boy to prison for life, for some fifty or sixty years, doomed to die in prison and leave in an oblong box, is in the best interests of society, but it is difficult to convince me that this is the case. The wrongful conviction should be reversed. This case should be retried, and retried as a non-capital case.
There are other reasons why I dissent. I cannot agree with the majority's approval of the blood-on-your-hands argument used by the State. As put in the majority opinion, the "prosecution argued to the jury ... that it was necessary to put Schoels to death in order to prevent him from killing others in the future, thereby saving innocent victims from the murderous hand of William Schoels." There are two reasons why such an argument is impermissible. The first is that there is absolutely no evidence in this case that Schoels was going to go out and kill "innocent victims." The type of fight that ended in the death of one of the combatants here simply does not lend support to the prosecutor's claim that the jury must end Schoels' life in order to "sav[e] innocent victims" from death. The second reason is that it is unfairly prejudicial in any case for a prosecutor, the representative of State authority, to try to convince lay jurors that the only way to spare the lives of innocent victims in the future is to return a death verdict. See Howard v. State, 106 Nev. 713, 719, 800 P.2d 175, 178 (1990) ("improper to ask the jury to vote in favor of future victims and against a defendant"); Castillo v. State, 114 Nev. 271, ___, 956 P.2d 103, 109 (1998) ("whether it will be an execution sentence for the killer ... or for a future victim of this defendant"); Sherman v. State, 114 Nev. ___, 965 P.2d 903 (1998) ("Do we execute a person who has killed ... or do we risk the execution of some very innocent people?").
Admitting that the prosecutor's argument was "improper" and that the district court's permitting this argument to be presented was error, the majority, nevertheless, says that the error was "harmless." What troubles me about the majority's view is its saying that it would "reverse the conviction or death penalty where the decision between life or death is a close one." There is no question but that Schoels shot his assailant during mutual combat.[3] Under these circumstances, the question of "life or death" is not a "close one"; it is nonexistent. This is not a death case; but if it were, it certainly must be said that "the decision between life or death [of this black teen-age youth] is a close one"; and, accordingly, the court should reverse the death penalty. In one's vain search for a justifiable explanation for the *745 death sentence prosecution and the resultant life without the possibility of parole sentence, this youth's race looms large among the possibilities.
Returning to the issue of arbitrary prosecutorial decisions as to who does and who does not have to face the death penalty in homicide cases, Justice Douglas put the problem in proper perspective when he wrote: "Under these laws no standards govern the selection of the penalty. People live or die, dependent on the whim of one man...." Furman v. Georgia, 408 U.S. 238, 253, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Douglas, J., concurring). As mentioned, the Supreme Court of Nevada Task Force Implementation Committee for the Elimination of Racial, Economic, and Gender Bias in the Justice System made formal findings and recommended the adoption of prosecutorial standards for prosecutors in death cases. I believe that until such standards are adopted in Nevada, we are going to continue to see arbitrary decision making by prosecutors based on prosecutors' personal, moral or ideological backgrounds and upon a variety of other factors, including the level of public outcry, race and unacceptable political considerations. Unfettered prosecutorial discretion and unstructured plea bargaining practices naturally tend to result in arbitrary and discriminatory sentences being sought and imposed by reason of an ever-broadening class of death-eligible defendants conjured by zealous prosecutors, unrestrained by any objective standards for selecting those cases in which the death penalty is going to be sought.
This court should attend to the recommendations of its own Task Force, a body which made official findings that African Americans and other minorities are very much over-represented on death row. Minority offenders constitute half of those who are given the death sentence in murder cases.[4] In seeking the cause of this imbalance, the Task Force focused on the breadth of prosecutorial discretion. The Task Force was unable to discern just what factors went into prosecutorial choices relative to the death penalty and stated that it "could do no more than speculate or generalize based on anecdotal information about what the District Attorneys in Nevada do when having to decide whether a homicide should be treated as a capital crime." Supreme Court of Nevada Task Force Implementation Committee for the Elimination of Racial, Economic, and Gender Bias in the Justice System, Final Report: Findings and Recommendations, ADKT 160, at 70 (June 18, 1998). This being the case, the Task Force recommended legislation revising death penalty statutes in a way that would "mandate uniformity within the state of the decisions and methods for seeking the death penalty for
those eligible pursuant to NRS 200.033." Id. In my view, this court should take the lead in setting such standards of uniformity.
One way that some uniformity could be achieved would be, according to the Task Force, to require prosecutors to provide "a detailed description of the procedures followed in reaching a decision as to whether to prosecute a homicide as a capital case." Id. The Task Force concluded that it was necessary to determine "[w]hat factors are taken into account in addition to the statutory aggravating circumstances listed in the NRS, in deciding to prosecute a homicide that is deemed to have one or more aggravating circumstances." Id. The Task Force recognized that at present there is no "uniformity" and no standardized "procedures followed in reaching a decision" as to whether to seek the death penalty and wisely recommended *746 that steps be taken to correct this defect in the death sentencing process.
Although the Supreme Court of the United States has not decided a case which condemns unrestricted breadth of prosecutorial discretion, I certainly think that it is time, under our State Constitution, that both this court and our legislature addressed this serious problem. Justices Stevens, Blackmun and Marshall agreed with Justice Brennan's dissent, in which he recognized the problem in McCleskey v. Kemp, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), and expressed his concern over the "myriad of opportunities for racial considerations" that are inherent in the exercise of such broad prosecutorial discretion, and decried the fact that "[n]o guidelines govern prosecutorial decisions to seek the death penalty." Id. at 333, 107 S.Ct. 1756 (Brennan, J. dissenting). The Task Force recognized a very serious defect in our capital sentencing jurisprudence; and I feel strongly that this court should recognize that, under the Equal Protection Clause and the Due Process Clause, some standards for prosecutorial discretion must be put in place throughout the State. Lack of state-wide standards and guidance for individual prosecutors with respect to the death decision virtually assures that the death penalty will be sought arbitrarily and, occasionally, imposed arbitrarily. We are very much in need of a systematic and reviewable narrowing procedure for determining death eligibility during the early critical stage of prosecution.
This conviction should be reversed and remanded for trial before a jury that is not death-qualified, a jury that does not have to hear a morally and legally groundless argument that Schoels should be lethally injected and a jury that is not told that it must bring in a death verdict or have blood on its hands.
Schoels' unfair trial is in large part attributable to Nevada's faulty death-sentencing scheme, which permits and encourages arbitrary and baseless capital prosecutions. I urge this court to adopt standards of uniformity for prosecution of capital cases in a manner that will be "fair and consistent" and will not subject prosecutors to accusations, founded or unfounded, that they are basing their life or death choices on racial or other arbitrary and impermissible grounds.
NOTES
[1] NRS 174.035(1) provides: "A defendant may plead not guilty, guilty, guilty but mentally ill or, with the consent of the court, nolo contendere. The court may refuse to accept a plea of guilty or guilty but mentally ill."
[2] Jury Instruction No. 8 provided:

Premeditation is a design, a determination to kill, distinctly formed in the mind at any moment before or at the time of the killing. Premeditation need not be for a day, an hour or even a minute. It may be as instantaneous as successive thoughts of the mind. For if the jury believes from the evidence that the act constituting the killing has been preceded by and has been the result of premeditation, no matter how rapidly the premeditation is followed by the act constituting the killing, it is willful, deliberate and premeditated murder.
[3] Jury Instruction No. 19 provided:

Voluntary manslaughter is the unlawful killing of a human being without malice, express or implied, without any admixture of deliberation. It must be voluntary, upon a sudden heat of passion caused by a provocation apparently sufficient to make the passion irresistible. In cases of voluntary manslaughter, there must be a serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury on the person killing.
The killing must be the result of that sudden, violent impulse of passion supposed to be irresistible; for, if there should appear to have been an interval between the assault or provocation given and the killing, sufficient for the voice of reason and humanity to be heard, the killing should be attributed to deliberate revenge and punished as murder.
[4] "[T]here must be ... an attempt by the person killed to commit a serious personal injury to the person killing."
[5] Jury Instruction No. 27 provided:

If one is confronted with the appearance of danger which arouses in one's mind, as a reasonable person, an honest conviction and fear that one is about to suffer great bodily injury, and if a reasonable person in a like situation, seeing and knowing the same facts, would be justified in believing oneself in like danger, and if the person so confronted acts in self-defense upon such appearances and from such fear and honest convictions, the right of self-defense is the same whether such danger is real or merely apparent.
[6] Schoels refers to many instances of the prosecutor's use of "we," "us" and "our," such as: "We watch and we administer, we get satisfaction in revenge...."; "[T]he death penalty is reserved for the worst of us."; "Think about that and relate it to our case."
[7] Thus, contrary to the dissent, Schoels was not, at the time of this homicide, locked in a life-or-death situation from his standpoint.
[8] In Redmen v. State, 108 Nev. 227, 235, 828 P.2d 395, 400 (1992), overruled on other grounds by Alford v. State, 111 Nev. 1409, 1415 n. 4, 906 P.2d 714, 717 n. 4 (1995), we concluded, and now re-affirm, that prosecutors may argue future dangerousness in death penalty litigation where there is no evidence of violence independent of the murder in question.
[9] Schoels urges this court to follow two jurisdictions that require the defense to argue last during the penalty phase where the death penalty is involved. A Kentucky statute provides that "the prosecuting attorney shall open and the defendant shall conclude the argument." Ky.Rev.Stat. 532.025(1)(A). The California Supreme Court determined that "[e]qual opportunity to argue is... consistent with the Legislature's strict neutrality in governing the jury's choice of penalty.... Accordingly, hereafter the prosecution should open and the defense respond. The prosecution may then argue in rebuttal and the defense close in surrebuttal." People v. Bandhauer, 66 Cal.2d 524, 58 Cal.Rptr. 332, 337, 426 P.2d 900 (1967), cert. denied, 389 U.S. 878, 88 S.Ct. 178, 19 L.Ed.2d 167 (1967).
[1] One of the considerations that moved me to raise the issues of overcharging and unrestricted prosecutorial discretion on my own was the report to the court of its Supreme Court of Nevada Task Force Implementation Committee for the Elimination of Racial, Economic, and Gender Bias in the Justice System. One of the major concerns of the Task Force was the untrammeled power of prosecutors to decide who should live and who should die. The Task Force resolved that measures should be taken to "develop uniform procedures and criteria for determining which murder cases should be capital cases." Implementation Plan at F3, ADKT 160 (August 4, 1998). Without such standards being in place, prosecutors are necessarily subject to being suspected of letting racial or other biases enter into the life-death decision making process. The Task Force saw the development of standards, "procedures" and "criteria" for making this vital decision as a necessity in order to make "sure that the [death sentence process] is fair and consistent." Id.

Prosecutors' death penalty decisions cannot, the Task Force reasoned, be fair and consistent unless there are some standards upon which to judge the fairness and consistency of these decisions. In the case now before us, we have a black youth who killed another black youth in mutual combathardly, as the jury in this case recognized, a death case, maybe not even a first-degree murder case. Any prosecutor's decision to seek the death penalty in a case such as this one is going to be justifiably subject to inferences that race was a factor in the decision-making process. This case shows rather vividly that the Task Force was correct in recommending to us that procedures and criteria must be put in place to limit the presently unlimited discretion of prosecutors in making these critical decisions.
Obviously, the recommendations of the Task Force are not binding on the court nor do they provide a basis for reversing this or other convictions and sentences based on apparent abuses of prosecutorial discretion. I cite the Task Force report to show the perceived need to avoid appearances of racial bias in the death sentencing process. If the Task Force recommendations had been implemented, it would have been more difficult for me to make a case for reversal on the basis of the misuse of prosecutorial discretion.
[2] This "aggravator" is designed to apply in cases in which some "hazardous" device (perhaps a bomb or incendiary "device") is employed to carry out a murder. This aggravator could be properly applied in some firearms cases, for example, where the murderer is firing into a crowd. The ordinary shooting, however, where A shoots B, cannot very well be characterized as knowingly creating a risk of death to more than one person by hazardous means. If it were otherwise, virtually every shooting murder would become a capital offense because, certainly, it is in almost any shooting case remotely possible that a projectile might exit the body of the victim and injure another person. The run-of-the-mill shooting is not, however, what this aggravator is all about. In the typical shooting, the shooter is not "knowingly" creating a risk of death for others and ordinarily has nothing in mind other than shooting his victim. That is the case here. Schoels was engaged in hand-to-hand combat with another youth who had threatened to go get a gun and shoot him. During their wrestling match Schoels shot twice into the body of the man with whom he was fighting. Two bullets entered the other youth's body. One of the bullets penetrated the aorta, causing death. It cannot be honestly said that Schoels knowingly, or otherwise, created a risk of death to anyone other than the person whom he shot at short range.
[3] The majority exaggerates the "dangerousness" of this youth. Schoels' assailant threatened to go get a gun and shoot him. The record tells me that Schoels drew his weapon only after his assailant tackled him and a fight ensued between Schoels and a man who had threatened his life. I think it is extremely unfair to try to characterize this young man as a blood-thirsty killer who is likely to go out and kill innocent people.
[4] I note that the Task Force does not claim that its statistics, per se, support the conclusion that the death sentence is applied in a discriminatory manner. The Task Force's study does, however, lead one to the conclusion that standards must be imposed on presently unrestrained prosecutorial discretion. If standards were in place, it would be much easier to compare decision-making factors and to identify cases in which the only factor that could have led to the decision to seek the death penalty was the defendant's race or other improper considerations. In other words, even if prosecutors are not, in fact, making decisions based upon improper racial considerations, the adoption of standards would, nevertheless, help to minimize the appearance of impropriety that naturally arises when those with unfettered discretion target for the harshest penaltiesin a disproportionate mannerblack defendants. It would also serve to temper any temptation to engage in improper racial discrimination in the future.