WILLIAM PATRICK CASTILLO, Appellant, v.
THE STATE OF NEVADA, Respondent.

No. 29512

April 2, 1998

956 P.2d 103

[Rehearing denied November 25, 1998]

*David M. Schieck,* Las Vegas, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart Bell,* District Attorney, Clark County, and *James Tufteland,* and *Ronald C. Bloxham,* Chief Deputy District Attorneys, Clark County, for Respondent.

## OPINION

*Per Curiam:*

In late November 1995, appellant William Patrick Castillo held a job as a roofer in Las Vegas. Harry Kumma, a former co-worker, contacted Castillo and two other roofing employees, Kirk Rasmussen and Jeff Donovan, about completing a side job. The side job involved re-roofing the residence of the victim, Isabelle Berndt.

Kumma, Rasmussen, Donovan, and Castillo worked on Berndt's roof on November 25, 1995. While performing ground cleanup at Berndt's residence, Castillo indicated to Donovan that he found a key to Berndt's home and wanted to enter. Donovan told Castillo that he should not and directed Castillo to return the key to the place where he found it. In response, Castillo stated "I'll just come back later at nighttime."

At some time during the roofing job, Castillo asked Kumma to lend him $500 so that Castillo could pay his lawyer for services rendered in connection with an unrelated criminal battery charge. Kumma did not lend Castillo the money.

Prior to these events, Castillo began residing with his girlfriend, Tammy Jo Bryant, and a friend, Michelle Platou. At about 6:00 p.m. on December 16, 1995, Castillo left the apartment with Platou in Platou's car. The two returned to the apartment at approximately 3:00 a.m. on the morning of December 17, 1995, with a VCR, a box containing silverware, and a bag containing knit booties. A few minutes later, Castillo and Platou again departed. They returned about twenty minutes later.

At about 9:00 or 10:00 a.m. on December 17, 1995, Castillo and Platou allegedly informed Bryant that they had committed a robbery and stolen several items. According to Bryant, Castillo and Platou further informed her that while in the house, Platou inadvertently bumped into a wall and made some noise. Castillo and Platou allegedly told Bryant that Castillo then hit a sleeping person with a tire iron Castillo brought into the house. The two then departed the scene. According to Bryant, they further stated that, out of fear that they left incriminating fingerprints on the

wall of the house, they returned to the residence at 3:00 a.m. to burn down the house.

In the early morning hours of December 17, 1995, neighbors notified the police that Berndt's residence was ablaze. Fire-fighters found Berndt's body inside the house. An arson investi-gator determined that two independent fires, set by "human hands," using some type of accelerant, caused the blaze. Investi-gators found a charred bottle of lighter fluid at the scene and several spots in the living room where an accelerant was present. Laboratory tests confirmed these findings.

According to the coroner's autopsy report, Berndt suffered "multiple crushing-type injuries with lacerations of the head, crushing injuries of the jaws," and several broken teeth. Berndt also had deep lacerations on the back of the head and injuries to the face and ears. According to the coroner, all injuries were contemporaneous. The coroner testified that Berndt died as a result of an intracranial hemorrhage due to blunt force trauma to the face and head. The coroner further testified that these injuries were consistent with blows from a crowbar or tire iron.

A Las Vegas Metropolitan Police Department crime analyst investigated Berndt's residence and observed fire, smoke and water damage in the living room, kitchen and master bedroom. He noted that dresser drawers had been opened, two jewelry boxes had been opened, and the house had been "ransacked." The crime analyst also observed blood marks on the wall next to Berndt's body, which was found lying on a bed.

On December 17, 1995, Berndt's only child, Jean Marie Hosking, arrived at Berndt's residence. She searched the house and determined that her mother's silverware was missing. This silverware featured a distinctive floral pattern, had an engraved "B" on each piece, and was stored in a wooden box on the shelf in Berndt's bedroom. Also missing were a VCR, Christmas booties Berndt was knitting for her grandchildren, and eight $50 U.S. savings bonds.

On December 19, 1995, Rasmussen, one of Castillo's coworkers, contacted the police. According to Rasmussen, dur-ing the carpool to work on December 18, 1995, Castillo said, "This weekend I murdered an 86-year-old lady in her sleep." Castillo also allegedly stated that he entered Berndt's house with the intent to steal Berndt's valuables, hit Berndt numerous times with a tire iron, and heard her "gurgling" in her own blood, before he put a pillow over her head to smother her. Castillo also allegedly told Rasmussen that he had stolen a VCR, money, and silverware and that he intended to sell these items to raise money to pay his attorney.

The following morning, Castillo allegedly told Rasmussen that

the crime had been reported on the news. On December 19, Rasmussen drove by Berndt's residence, saw that it had been burned, and contacted the police to report what he had learned.

On the evening of December 19, 1995, Charles McDonald, another roofer, visited Castillo's apartment. Castillo offered to sell a set of silverware to McDonald for $500. McDonald testified that the silverware was in a wooden box. When McDonald later viewed Berndt's silverware, he noted that it appeared to be the same silverware that Castillo tried to sell to him.

Based upon the information provided by Rasmussen, police obtained and executed a search warrant on the apartment shared by Castillo, Bryant, and Platou at 10:00 p.m. on December 19, 1995. Castillo and Bryant were present when the police arrived and permitted them to enter; both Castillo and Bryant gave their consent to a search of their apartment. Police recovered the silverware, the VCR, the booties, and a bottle of lighter fluid from the apartment. The officers also located a notebook with the notation "$50, VCR, $75, camera, silverware."

After execution of the search warrant, the officers arrested Castillo. At the detective bureau, Castillo waived his *Miranda* rights and made statements during two separate, consecutive interviews. During the first interview, Castillo indicated that he had received the VCR and other property from a friend. Shortly after the first interview ended, the detectives returned and informed Castillo of the evidence that had been obtained against him from Bryant and Rasmussen. Castillo then confessed to the killing, robbery, and arson.

Subsequently, Castillo pleaded not guilty on all counts, and a jury trial commenced August 26 and concluded on September 4, 1996. The prosecution presented all the evidence cited above in its case in chief. The defense did not put on a case in chief. The jury returned guilty verdicts on all counts: conspiracy to commit burglary, burglary, robbery of a victim sixty-five years or older, first-degree murder with use of a deadly weapon, conspiracy to commit burglary and arson, and first-degree arson.

Castillo's penalty hearing took place from September 19 to September 24, 1996. Bruce Kennedy of the Nevada Youth Parole Board testified about Castillo's extensive juvenile history and record. Kennedy became acquainted with Castillo in 1984 while Kennedy was a parole counselor at the Nevada Youth Training Center in Elko. Kennedy's testimony revealed: (1) Castillo began running away from home regularly when he was nine years old, (2) by 1984, Castillo had already been charged with attempted murder, petty larceny, and six counts of arson (including an incident in which he tried to burn down the Circus Circus Hotel in Las Vegas), and (3) much of Castillo's criminal misbehavior

remained uncharged. Kennedy also testified that, by the age of fifteen, Castillo had already used marijuana, speed, cocaine, and alcohol.

Due to his extensive misbehavior, Castillo participated in numerous Nevada state juvenile programs, lived with family members in different areas of the country for short periods of time and ultimately returned to Nevada. During his adolescence, doctors determined that Castillo understood the difference between right and wrong, did not suffer from a neurological disorder, but suffered from a personality disorder.

Other State witnesses testified that in 1990, at age seventeen, Castillo escaped from a Nevada youth training facility; Castillo was arrested for attempted burglary and later certified to adult status on charges arising from this incident. Castillo served fourteen months in prison, expiring his term. In April 1993, Castillo was convicted of robbery arising from an incident which occurred in December 1992. Castillo had a gun during that robbery. Castillo was sentenced to three years, served just under two years, committed multiple disciplinary infractions while in prison, and was released in May 1995.

In June 1995, Castillo participated in the armed robbery of a cashier, but was not formally charged. In December 1995, Castillo was charged with battery upon one of his neighbors. These charges were pending at the time of the instant trial.

After this extensive testimony about Castillo's prior criminal behavior, the State introduced victim impact evidence through testimony by Berndt's granddaughters and Berndt's daughter, Hosking. These individuals testified about their personal interaction with Berndt, the quality of Berndt's life, and the effect of Berndt's death on their lives.

The first defense witness, a neuropsychologist, testified that Castillo: had been emotionally, mentally, physically and behaviorally abused; suffered from "reactive attachment disorder" and "attention deficit hyperactivity disorder;" and came from a dysfunctional family. One correctional officer and one juvenile facility counselor testified as to several positive episodes regarding Castillo.

Thereafter, Castillo's girlfriend, Bryant, testified that Castillo had few social skills, acted like a "big kid," but was trying to improve. Castillo's mother testified that Castillo had a difficult upbringing due to the physical and emotional abuse he received from his biological father, her own lack of affection for Castillo, and the family's instability. At the hearing's conclusion, Castillo read an unsworn statement to the jury expressing his feelings including regret and remorse concerning his conduct.

The jury returned a verdict of death, finding four aggravating

circumstances and three mitigating circumstances. The jury found that the aggravating circumstances were that the murder was committed: (1) by a person previously convicted of a felony involving the use or threat of violence, specifically, a robbery committed on December 14, 1992; (2) while Castillo was committing burglary; (3) while Castillo was committing robbery; and (4) to avoid or prevent a lawful arrest. The jury found the following mitigating circumstances: (1) the youth of the defendant at the time of the crime; (2) the murder was committed while the defendant was under the influence of extreme emotional distress or disturbance; and (3) any other mitigating circumstances.

Castillo alleges that the district court committed seven reversible errors, three during the guilt phase of his trial.

First, Castillo contends that the district court improperly allowed repeated testimonial references to the booties Berndt knitted for her grandchildren. He contends that this testimony was irrelevant and prejudicial; Castillo further contends that the references amounted to an improper emotional appeal to consider the victim's family and constituted improper victim impact evidence. Castillo also contends that the admission of the testimony relating to the booties violated his rights to due process and a fair trial.

Relevant evidence is ''evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.'' NRS 48.015. Although generally admissible, relevant evidence is inadmissible if its probative value is substantially outweighed by unfair prejudice, if it confuses the issues, or if it amounts to the needless presentation of cumulative evidence. NRS 48.025; NRS 48.035. District courts are vested with considerable discretion in determining the relevance and admissibility of evidence. Atkins v. State, 112 Nev. 1122, 1127, 923 P.2d 1119, 1123 (1996), *cert. denied,* 520 U.S. 1126, 117 S. Ct. 1267 (1997).

Hosking and Rasmussen each briefly discussed the booties in their testimony. Testimony about the booties served to connect the booties found at Castillo's apartment with the crime scene. We conclude that this testimony was generally relevant, sufficiently brief so as not to have prejudiced Castillo, and not unnecessarily cumulative. Thus, we conclude that its admission did not deprive Castillo of his rights to due process or a fair trial.

Second, Castillo contends that admission of a family photograph and autopsy photographs depicting Berndt amounted to impermissible victim impact evidence. Castillo contends that the prejudicial effect of these photographs substantially outweighed their probative value.

The admissibility of photographs is within the sound discretion of the district court. Greene v. State, 113 Nev. 157, 167, 931 P.2d 54, 60 (1997). It is within the district court's discretion to exclude photographs when their prejudicial effect substantially outweighs their probative value. *Id.*

We conclude that the family photograph was relevant on the issue of Berndt's identity and accurately depicted her six months prior to the killing; this photograph also provided a comparison with her appearance in the autopsy photographs. Accordingly, we conclude that the probative value of the family photograph outweighed its prejudicial effect thus the district court did not abuse its discretion by admitting it.

With respect to the autopsy photographs, this court recently reiterated its position that even gruesome photographs are admissible if they aid in ascertaining the truth, and that " 'despite gruesomeness, photographic evidence has been held admissible when . . . utilized to show the cause of death and when it reflects the severity of wounds and the manner of their infliction.' " Browne v. State, 113 Nev. 305, 314, 933 P.2d 187, 192 (1997) (Quoting Theriault v. State, 92 Nev. 185, 193, 547 P.2d 668, 674 (1976).

Here, the autopsy photographs reveal the extent and severity of Berndt's injuries. In light of the considerable discretion afforded the trial court in deciding whether to admit photographic evidence and this court's pronouncements in *Browne,* we conclude that the district court did not abuse its discretion in admitting the autopsy photographs.

Third, Castillo contends that the State improperly elicited testimony from Kumma indicating the subject of another case in which Castillo was involved. The district court judge made a pretrial ruling barring admission of evidence of "why the fees [to his attorney] were incurred" but allowing evidence of the fact of Castillo's debt to his attorney on the issue of motive. Despite this pretrial ruling, the district court permitted Kumma to testify that Castillo was involved in "another case." Castillo contends that in light of its pretrial ruling, the district court abused its discretion

by allowing this testimony and erred in refusing to declare a mistrial on the basis of this admission.

Our review of the challenged testimony reveals that the testimony the prosecutor elicited from Kumma did not disclose the nature of the other case in which Castillo was involved, namely, whether it was criminal or civil; thus, the prosecutor did not violate the district court's pretrial ruling on the matter. We conclude that even if Kumma's testimony was improper, the inadvertent reference to Castillo's prior criminal conduct did not warrant a mistrial. Therefore, we conclude that the district court did not err in refusing to declare a mistrial on this basis.

Castillo contends that the district court committed four additional, reversible errors during his penalty hearing.

Castillo contends that the prosecutor's improper argument concerning future victims mandates a new penalty hearing pursuant to Howard v. State, 106 Nev. 713, 800 P.2d 175 (1990) (*"Howard II"*). Castillo further contends that the prosecutor's argument "went far beyond that Castillo might be a future danger."

This improper prosecutorial argument to which Castillo objected at trial, was as follows:

> The issue is do you, as the trial jury, this afternoon have the resolve and the intestinal fortitude, the sense of commitment to do your legal and moral duty, for whatever your decision is today, and I say this based upon the violent propensities that Mr. Castillo has demonstrated on the streets, I say it based upon the testimony of Dr. Etcoff and Corrections Officer Berg about the threat he is to other inmates, and I say it based upon the analysis of his inherent future dangerousness, whatever your decision is today, and it's sobering, whatever the decision is, you will be imposing a judgment of death and it's just a question of whether it will be an execution sentence for the killer of Mrs. Berndt or for a future victim of this defendant.

This court has held that a prosecutor may argue the future dangerousness of a defendant during a penalty hearing even "where there is no evidence of violence independent of the murder in question." Jones v. State, 113 Nev. 454, 469, 937 P.2d 55, 64 (1997) (citing Redman v. State, 108 Nev. 227, 235, 828 P.2d 395, 400 (1992)). Here, the prosecutor presented to the jury copious evidence of Castillo's dangerous propensities. Specifically, Dr. Etcoff, a psychologist for the defense, testified on

cross-examination that Castillo told him: (1) he had a "God-like" complex when he had a gun, (2) he had committed many crimes, and (3) he was not afraid of punishment. Dr. Etcoff also testified that due to Castillo's attitude, Castillo was likely to be more rebellious in prison, act aggressively and anti-socially, and injure people without remorse. Dr. Etcoff further testified that in the past, Castillo had been violent in prison, even in the high security wing, and that Castillo would continue to pose a security threat.

Corrections Officer Mark Berg testified that while serving a sentence in the Northern Nevada Corrections Center in 1992 and 1993, Castillo assaulted other inmates on at least two separate occasions, and breached other prison security regulations. We conclude that in addition to the violent nature of the crime in this case, we conclude that there exists copious evidence to support the future dangerousness theory presented by the prosecution.

We also conclude, however, that portions of the prosecutor's future dangerousness argument were improper. We take this opportunity to sharpen the line that separates proper from improper future dangerousness argument.

In *Jones v. State,* this court admonished the prosecutor for suggesting that the defendant, Jones, might have intended to use weapons, found in his cell before trial, to inflict bodily harm upon members of the jury. 113 Nev. 454, 469, 937 P.2d 55, 64-65 (1997). Our admonition in the *Jones* case clarified our position that personalizing the identity of a defendant's potential future victim is improper. Absent abundant evidence of guilt, such conduct might merit a new penalty hearing. We affirmed this position in McGuire v. State, 100 Nev. 153, 158, 677 P.2d 1060, 1064 (1984) where we declared improper a prosecutor's attempt to personalize the identity of a future victim, by suggesting that individual jurors place themselves in the position of the victim or a member of the victim's family.

In *Howard v. State* we held that it is also "improper to ask the jury to vote in favor of future victims and against the defendant." 106 Nev. 713, 719, 800 P.2d 175, 178 (1990). In the instant case, the prosecutor presented to the jurors just such a choice when he said, "you will be imposing a judgment of death and it's just a question of whether it will be an execution sentence for the killer of Mrs. Berndt or for a future victim of this defendant." This language improperly suggests that the jury must decide whether to execute the defendant or bear responsibility for the death of an innocent future victim. Presenting the jury's decision as a choice between killing a guilty person or an innocent person will likely result in a juror's decision to impose the death penalty more often than if the jury's decision had been portrayed in its proper light.

The test for evaluating whether an inappropriate comment by the prosecutor merits reversal of the defendant's conviction is whether the inappropriate comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Bennett v. State, 111 Nev. 1099, 1105, 901 P.2d 676, 680 (1995). We conclude that although a portion of the prosecutor's argument was improper, the improper portion did not unfairly prejudice Castillo in light of the overwhelming evidence of his guilt.

Castillo contends that testimony from Berndt's daughter and two granddaughters was unduly repetitive and constituted improper and cumulative victim impact evidence. Castillo contends that the district court's failure to limit "the nature and scope of this testimony to avoid the arbitrary and capricious entry of the death penalty" violated the Due Process Clause and the Nevada Constitution.

The three victim impact witnesses were each related to Berndt. They testified about the quality of Berndt's life and the impact of her death upon themselves and other family members. They also spoke about periods of time they spent with Berndt. This court has previously concluded that similar testimony did not violate the defendant's constitutional rights. *See* Wesley v. State, 112 Nev. 502, 519-20, 916 P.2d 793, 804 (concluding that repetitive testimony of victim's three friends, two of whom testified that the victim was a father figure in their lives, did not violate the defendant's constitutional rights). The policy underlying admission of victim impact evidence in penalty hearings strongly favors affirming the decision and penalty in the instant case. Furthermore, Castillo's position is untenable because it contradicts relevant case law and requires reinterpretation of the Nevada Constitution. Accordingly, we conclude that the district court did not abuse its discretion in permitting all three witnesses to testify.

Castillo contends that "the anti-sympathy" jury instruction violated his Eighth Amendment rights because "it undermined the jury's constitutionally mandated consideration of mitigating evidence."

The district court instructed the jury as follows: "A verdict may never be influenced by sympathy, prejudice or public opinion. Your decision should be the product of sincere judgment and sound discretion in accordance with these rules of law." This court approved this instruction in *Wesley,* 112 Nev. at 519. 916 P.2d at 803-04, stating that it is proper when offered in conjunction with an instruction regarding the consideration of mitigating

factors. The record here reveals that Castillo's counsel argued mitigation during his penalty phase closing argument, that the district court properly instructed the jury regarding mitigation, and that the jury in fact found three mitigating factors. Accordingly, we conclude that this argument lacks merit.

Castillo contends that the district court erred in refusing to instruct the jury regarding five nonstatutory mitigating circumstances.

At the penalty phase, the district court approved the defense's request to give jury instructions as to three statutory mitigating circumstances: the youth of the defendant, that the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance, and "any other mitigating circumstances." The district court denied the defendant's request to instruct the jury separately on five nonstatutory mitigating circumstances, namely, that the defendant: (1) has admitted his guilt of the offense charged, (2) has demonstrated remorse for the commission of the offense, (3) cooperated with police after he was identified as a suspect, (4) had not planned to commit the murder; and (5) had a difficult childhood.

This court reviews a district court's refusal to give a proposed nonstatutory mitigating jury instruction for an abuse of discretion, or judicial error. Howard v. State, 102 Nev. 572, 578, 729 P.2d 1341, 1345 (1986) (*"Howard I"*). Castillo cites Lockett v. Ohio, 438 U.S. 586 (1978) in support of his argument. There, a four-justice plurality of the United States Supreme Court concluded that a death penalty statute entirely precluding the sentencer from considering as a mitigating factor any aspect of the defendant's character or record violates the Eighth and Fourteenth Amendments. *Id.* at 606-08. In Boyde v. California, 494 U.S. 370, 380-86 (1990), however, the Court determined that a mitigating circumstances instruction similar to the Nevada "catchall" provision satisfied constitutional standards.

Here, the district court instructed the jury to consider three mitigating circumstances, including the "catchall" provision. The jury returned a verdict of death after finding four aggravating circumstances and three mitigators. Clearly, the jury considered the mitigating circumstances. Thus, we conclude that the district court properly refused to give Castillo's proposed instructions on the grounds that they would have amounted to inappropriate comment on the evidence by the court and that Castillo was free to argue these outside factors under the "catchall" mitigation instruction.

Finally, we conclude that the death sentence imposed upon Castillo was not the product of passion, prejudice, or any arbitrary factor, nor was it excessive in light of the gravity of the crime and the defendant. *See* NRS 177.055(2). Thus, we affirm the jury verdict and sentencing in all respects.[1]

---

[1]The Honorable A. William Maupin, Justice, did not participate in the decision of this appeal.