121 P.3d 567 (2005)
Alfonso Manuel BLAKE, Appellant,
v.
The STATE of Nevada, Respondent.
No. 43699.
Supreme Court of Nevada.
October 20, 2005.
*570 Philip J. Kohn, Public Defender, and Robert L. Miller, Deputy Public Defender, Clark County, for Appellant.
Brian Sandoval, Attorney General, Carson City; David J. Roger, District Attorney, Steven S. Owens, Chief Deputy District Attorney, and Robert J. Daskas, Deputy District Attorney, Clark County, for Respondent.
Before the Court En Banc.

OPINION
GIBBONS, J.
Appellant Alfonso Manuel Blake shot Sophear Choy and Priscilla Van Dine to death and shot but failed to kill Kim Choy. The jury found Blake guilty of two counts of first-degree murder with the use of a deadly weapon and returned a sentence of death. The jury also found Blake guilty of attempted murder with the use of a deadly weapon, and he was sentenced to two consecutive terms of 96 to 240 months in prison.
Blake alleges a number of errors occurred in the district court, none of which, we conclude, warrant relief. Accordingly, we affirm the judgment of conviction and sentence of death.

FACTS

Guilt phase
In November 2002, Kim Choy moved to Las Vegas and began dancing at various clubs in town to earn money for school. Eventually, her younger sister, Sophear Choy, joined her and worked as a cocktail *571 waitress and later danced at local clubs. While dancing at one club, Sophear befriended Priscilla Van Dine, also known as Sheila. Also through her employment, Sophear met Blake.
In late February or early March 2003, Kim, Sophear, and Sheila met Blake at a bar. During the course of the evening, Blake told Kim that he had a house and would be willing to rent three rooms to her, Sophear, and Sheila. He told Kim that he did not live at the house but that three other women did. Regarding the rental arrangement, Blake informed Kim that each of the women would pay $500 per month and he would pay for health insurance and a gym membership. Kim told Blake that she would think about it. She and Blake agreed that in the meantime she, Sophear, and Sheila would store some of their belongings in Blake's garage.
About two days later, Kim, Sophear, and Sheila dropped off their belongings at Blake's house. However, feeling uncomfortable with the arrangement the women decided not to move in. On March 3, 2003, Kim called Blake and informed him of their decision and thanked him for allowing them to store their belongings in his garage. Blake was upset by this news. Kim arranged to go over and retrieve their belongings the next night, around 11 p.m. On March 4, 2003, Kim, Sheila, and two of their friends drove to Blake's house in two vehicles, and without much incident they loaded their vehicles. Unable to load everything, Kim told Blake that they would return for the remainder of their belongings that evening.
Sophear and Sheila accompanied Kim on the second trip. During the trip, Sophear had a phone conversation with Blake. Kim heard Blake screaming and Sophear telling Blake not to put their belongings on the street corner. When the women reached Blake's neighborhood, they noticed some of their possessions on a street corner. The women began loading their Denali SUV. Two cars soon pulled up behind the Denali. Blake rushed out of one of the vehicles and nudged Sophear in the back. Blake's companions, Jinah Chung, Bonette Lim, and Aileen Ramos, surrounded Sophear. Nervous that Sophear was about to be beaten, Kim called 9-1-1 on her cell phone. Kim told the 9-1-1 operator that her sister was getting beat up at the corner of Decatur and Lone Grove. Whenever Blake or his accomplices looked at her, Kim pretended that she was on the phone with a girlfriend.
Blake began choking Sophear and hitting her head against boxes that had been loaded into the Denali. She unsuccessfully attempted to flee. Kim saw Sophear drop to the ground, and then she felt someone try to knock the phone out of her hand. When Kim turned around, Lim tried to hit her and grab the phone. Next, Blake approached, snatched the phone from Kim, and demanded to know to whom she was speaking.
Sophear, still slouched over, asked Kim to help her walk. Blake told Kim that "we all need to calm down" and that "we're going to take a walk and just calm down." Confused, Kim asked Sophear what was wrong. Sophear said that she could not walk or breathe. Blake ordered Kim to help Sophear walk. As Blake, Kim, Sophear, and Sheila walked toward an open desert area, Blake ordered Chung, Lim, and Ramos to leave the area.
After walking some distance, Blake told Kim, "Look what [Sophear] made me do, she made me fucking stab her." Blake then pushed Kim and Sophear together and said, "Okay, that's far enough." He grabbed Sheila's sweater, threw her down on the ground, and told the women to get on their hands and knees. Blake donned a pair of gloves, pulled a silver revolver out of his pocket, and said, "I warned you I didn't want any problems." He shot Sheila and then Sophear in the head. Blake pointed the gun at Kim, who waved her hand over her head and screamed. Blake shot, and the bullet ricocheted off a ring on Kim's right hand and hit her in the head. Blake shot Kim again in the head, and she lost consciousness.
When Kim woke up, Blake was gone. Kim stumbled across the desert area yelling for help. She came to a police car and told the officer that she, her sister, and a friend had been shot by Slinky (Blake's stage name). One of the officers ran to the area from which Kim emerged and found Sophear dead. *572 However, Sheila was still breathing. Paramedics transported Sheila to the University Medical Center Trauma Center, where she succumbed to her injuries a few hours later.
Meanwhile, Blake, although suffering from a stab wound, fled to Los Angeles with Chung, Lim, and his friend Vandal, in Chung's Blazer. During the drive, Blake and Vandal discussed Blake's alibi. Eventually the two concocted a story that Blake and Lim had been kidnapped and dumped in the desert and that Chung picked them up. Blake communicated the story to Ramos, who remained in Las Vegas. When they arrived in Los Angeles, Vandal wrapped Blake's gun in a towel and threw it in the sewer. They also stopped to buy hand cleaner. Blake scrubbed his hands with it and tossed the remainder down the sewer.
Eventually, Blake sought medical treatment for his injuries at a local hospital. He told personnel that his name was Marcus Edwards and that he had been mugged and stabbed. While at the hospital, Blake told a police officer that he was living with a friend in Los Angeles and had been stabbed outside a club in Hollywood.
Blake received a phone call at the hospital. Chung heard him say, "How could this be, there's no possible way. I shot them in the head." Blake left the hospital the day after checking in. He, Lim, and Chung drove to the San Bernardino, California, area and then headed back to Las Vegas. At approximately 4 a.m. on March 8, 2003, police officers in Barstow, California, who were on the lookout for Chung's Blazer, pulled the vehicle over with weapons drawn. Blake, Lim, and Chung were arrested without incident.
Dr. Gary Telgenhoff, a forensic pathologist with the Clark County Coroner's Office, performed autopsies on Sheila and Sophear. The autopsies revealed that both women had sustained gunshot wounds to the head. Additionally, there were a number of sharp force cuts and stabs on Sophear's left shoulder and back, behind her right ear, above her right breast, near her armpit, and on her right arm and hand. The cuts on her hands were consistent with defensive wounds. Dr. Telgenhoff concluded that the cause of the deaths of both women was gunshot wounds to the head and that the manner of death was homicide.
Blake called Arlene Oliver, his sister, to testify in his defense. Oliver stated that Blake appeared at her home around 3 a.m. on March 5, 2003. She testified that Blake appeared irrational and delusional. Blake told Oliver that he needed a ride. When he got into Oliver's car, he hid and appeared afraid, as if someone was after him. Oliver testified that she dropped off Blake in a parking lot on Valley View Road.
Dr. Mortillaro, a psychologist, also testified in Blake's defense. Dr. Mortillaro stated that he had administered a series of tests and spent several hours interviewing Blake. He also interviewed Oliver, Blake's brother, Anthony Fleming, and Ramos. Dr. Mortillaro opined that Blake appeared to have a compromised mental state at the time of the killings, meaning that "he would have difficulty determining right from wrong and thinking logically." He further testified that Blake exhibited elements of antisocial and histrionic behavior and narcissism. Dr. Mortillaro testified that, based on his interviews, when the killings occurred Blake exhibited characteristics of a brief psychotic disorder in which he was confused, delusional, and disconnected from reality and exercised poor judgment. Dr. Mortillaro also opined that Blake suffered from post-traumatic stress disorder (PTSD) resulting from the stab wounds he received.
On cross-examination, Dr. Mortillaro stated that his reconstruction of Blake's mental state on March 5, 2003, was not dependent upon the tests he administered but upon the accuracy of the information Oliver, Fleming, and Ramos provided. He acknowledged that the three told him that Blake was not violent and that Ramos told him that the shootings were out of character for Blake. However, Dr. Mortillaro acknowledged that he was unaware of a number of prior violent episodes involving Blake.
In rebuttal, the State's expert psychiatrist, Dr. Thomas Bittker, disagreed with Dr. Mortillaro's diagnosis that Blake suffered a brief reactive psychosis and stated that Dr. Mortillaro's opinion did not correspond to any professional *573 standard or to Dr. Bittker's clinical experience. Dr. Bittker also testified that Blake's PTSD resulted from the homicides themselves and not from being stabbed. Dr. Bittker concluded based upon a reasonable degree of medical certainty that Blake understood the nature of his actions during the early morning hours of March 5, 2003.
The jury found Blake guilty of the first-degree murders of Sophear and Sheila and the attempted murder of Kim, all with the use of a deadly weapon.

Penalty phase
The State alleged three aggravating circumstances with respect to both murders: (1) Blake had been convicted of a felony (the attempted murder of Kim) involving the use or threat of violence to the person of another; (2) the murder was committed to avoid or prevent a lawful arrest; and (3) Blake had been convicted of more than one offense of murder in the immediate proceeding. The State presented 13 witnesses at the penalty hearing. Several of these witnesses testified about Blake's prior violent outbursts, including: an incident in 1988 in which Blake hit a 17-year-old boy on the head with a baseball bat, resulting in a misdemeanor conviction of battery with substantial bodily harm; another 1988 incident in which he punched a female motorist twice in the face; a 1989 incident in which Blake stabbed another 17-year-old boy twice, resulting in a misdemeanor conviction for disorderly conduct; a 1992 incident in which Blake hit his girlfriend, threw her to the ground, and beat her; a 1992 incident in which Blake disengaged the fuel line of his girlfriend's car and placed it next to a wire that was connected to the positive post of the battery, resulting in a conviction for malicious destruction of personal property; and a 1992 incident in which he threatened to kill a man with a butcher knife. Chung also testified that Blake beat her on several occasions after she had undergone breast augmentation surgery at his suggestion.
There was also testimony respecting Blake's misdemeanor conviction for conspiracy to possess a controlled substance after Blake was apprehended with approximately 164 grams of marijuana and $1000 on his person. Blake also suffered a felony conviction for possession of a forged passport and was convicted of two misdemeanor counts of soliciting prostitution.
Several family members, including Kim, testified about the loss of their loved ones.
In mitigation, Blake presented several witnesses on his behalf. His mother, sister, brother, and niece testified that Blake was a caring, happy person who loved his family. They further testified that they would benefit from a continuing relationship with Blake.
Blake spoke in allocution, stating that there were no words to express his remorse and that he prayed that God would somehow ease the deep pain that he had caused. He also apologized to the family and friends of his victims and to the court and the district attorneys.
The jury found the three aggravating circumstances alleged by the State in each of the murders. The jury also found three mitigating circumstances: Blake's remorse; his mental, emotional, or physical state at the time of the incident; and no evidence of a long-standing plan to commit murder. However, the jury determined that any mitigating circumstances were insufficient to outweigh the aggravating circumstances and returned a sentence of death.

DISCUSSION

Cross-examination of Dr. Mortillaro
Blake argues that the State's cross-examination of Dr. Mortillaro respecting Blake's prior violent acts without the benefit a Petrocelli[1] hearing was reversible error. We disagree.
Dr. Mortillaro opined that Blake exhibited characteristics of a brief psychotic disorder on March 5, 2003, triggered by a traumatic event, i.e., being stabbed. He based his *574 opinion as to Blake's mental state at that time on his interviews with Blake, Oliver, Fleming, and Ramos. Dr. Mortillaro testified that Oliver described Blake as soft-spoken, mellow, and "not inclined to violence." He related that Fleming told him that harming others was not in Blake's character. And Ramos informed him that the shooting was out of character, "as [Blake] isn't the type of person who has violent tendencies." Dr. Mortillaro repeatedly stated that his opinion was based on the veracity of those he interviewed and acknowledged that if he were provided incomplete, inaccurate, or invalid information, his diagnosis might be invalid.
On cross-examination, the State sought to challenge Dr. Mortillaro's premise that Blake was not violent by cross-examining him on his lack of knowledge of a number of earlier violent outbursts by Blake. Specifically, the prosecutor queried Dr. Mortillaro about the following incidents: in 1988 Blake hit a man with a baseball bat and broke his nose; also in 1988 Blake argued with and punched a woman motorist twice in the face; in 1989 after agreeing to fight a man, Blake stabbed him twice; in 1992 Blake detached the gas line of his ex-girlfriend's car and laid a wire connected to the car's battery next to it; also in 1992 Blake threatened to kill a man with a knife; and again in 1992 he punched his girlfriend in the face, threw her down on the ground, and beat her. Dr. Mortillaro agreed that he "absolutely" would have preferred to have had this information prior to his diagnosis.
We conclude that Blake's reliance on Petrocelli is misplaced. The requirements of Petrocelli do not apply here because the challenged evidence in this case was not admitted pursuant to NRS 48.045(2). Rather, the State confronted Dr. Mortillaro with specific instances of Blake's past violent behavior to explore and challenge the basis of his opinion that Blake suffered a brief psychosis at the time of the shootings. Reference to these prior violent acts constituted proper cross-examination. It is a fundamental principle in our jurisprudence to allow an opposing party to explore and challenge through cross-examination the basis of an expert witness's opinion.[2]
Notably, defense counsel argued at trial that proceeding on an insanity defense did not place Blake's character at issue, "unless the doctor says that [he] had to rely on [Blake's] character to come to [his] conclusions." The record demonstrates that Dr. Mortillaro clearly relied on evidence indicating that Blake was not violent. And there is no evidence suggesting that the State lacked a good-faith basis for its query of Dr. Mortillaro.[3]
Blake also argues that the State's failure to request a limiting instruction prior to introducing the prior violent acts constitutes reversible error. However, on the morning after Dr. Mortillaro's testimony concluded, the district court admonished the jury that the prosecutor's questions respecting the prior violent episodes "were simply asked to determine the background and knowledge of Dr. Mortillaro in making his diagnosis." Blake fails to explain what additional instruction he desired the jury to receive. Accordingly, we deny relief on this basis.
Blake also asserts that the State never notified him that it intended to introduce the prior violent acts. However, the record reveals that the State listed Blake's criminal history in its notice of evidence in support of aggravating circumstances, filed approximately four months prior to trial. All of the *575 events about which Dr. Mortillaro was cross-examined, except Blake's 1992 battery of his girlfriend, were included in the notice. Blake does not explain what prejudice resulted from the alleged inadequate notice, and the record reveals none. Therefore, we deny relief on this basis.

Entry of plea of not guilty by reason of insanity
Blake claims that the district court committed constitutional error by forcing him to plead not guilty by reason of insanity. We disagree.
Twenty-one days before the trial began Blake filed a "reservation" of his right to plead not guilty by reason of insanity pursuant to NRS 194.010(3). At trial, just before jury selection, the State requested the district court to inquire whether Blake intended to plead not guilty by reason of insanity so that the State could arrange for its expert psychiatrist to evaluate Blake. Defense counsel responded that forcing him to enter a plea of not guilty by reason of insanity at that time deprived him of other defenses, particularly those set forth in NRS 194.010(4) and (5).
The district court disagreed and informed counsel that Blake had to indicate whether he intended to proceed with a plea of not guilty by reason of insanity but that he would be allowed to argue the defenses set forth in NRS 194.010. Blake then entered a plea of not guilty by reason of insanity.
Blake argues that the district court's ruling was erroneous because he complied with the statutory requirements of NRS 174.035(4) by reserving his right to plead not guilty by reason of insanity. We disagree. NRS 174.035(4) clearly requires that such a plea "be entered not less than 21 days before the date set for trial." Reserving the right to enter a plea is not equivalent to entering a plea. Therefore, Blake actually received an additional 21 days to decide his plea without being required to show good cause.[4]
We further consider unpersuasive Blake's argument that compelling him to enter a plea of not guilty by reason of insanity prejudiced his counsel's ability to present a defense and deprived him of his constitutional right to a fair trial. The jury received instructions regarding self-defense, defenses pursuant to NRS 194.010(4) and (5), and the lesser-included offenses of second-degree murder and voluntary manslaughter, as well as insanity. Additionally, counsel addressed these theories in closing argument. Accordingly, we deny relief on this basis.[5]

Instruction on consequences of a verdict of not guilty by reason of insanity
Blake requested the district court to explain to the jury the consequences of a verdict of not guilty by reason of insanity, i.e., such a verdict would result in Blake being taken into protective custody and transported to a forensic facility for evaluation as to whether he is mentally ill and subject to commitment to a mental facility.[6] The district court denied counsel's request, and Blake contends that this ruling was reversible error.
We have held that the district court should advise the jury of the consequences of a verdict of not guilty by reason of insanity.[7] However, the refusal to give such an instruction does not warrant automatic reversal.[8] Rather, reversal is warranted in cases where "the evidence against a finding of insanity is not overwhelming, and the jury is not otherwise apprised of the consequences of a verdict of not guilty by reason of insanity."[9]
The district court should have advised the jury of the consequences of a verdict of not guilty by reason of insanity. We conclude, *576 however, that Blake was not prejudiced by this omission. There was overwhelming evidence against a finding of insanity. Dr. Mortillaro testified that his opinion that Blake likely experienced a compromised mental state at the time of the killings was based on the veracity of the statements he received from Oliver, Fleming, and Ramos that Blake was not a violent person. However, the State's cross-examination severely undermined the credibility of Dr. Mortillaro's opinion by raising a host of prior violent actions by Blake of which Dr. Mortillaro was unaware when he formed his opinion. Dr. Mortillaro admitted that this information would have affected his opinion had he been aware of it. Additionally, the jury received conflicting expert evidence regarding Blake's mental state through Dr. Bittker's testimony.
The record also reveals other evidence demonstrating Blake's sanity. After initially stabbing Sophear, he ordered Chung, Ramos, and Lim to leave the scene. He then escorted Kim, Sheila, and Sophear into the desert, reflecting some premeditation. He ordered them to get on their hands and knees, pulled out a revolver, and shot each of them in the head. Approximately five minutes elapsed between the altercation resulting in knife wounds to Sophear and Blake and the shootings, allowing Blake a period of reflection before the shootings. He then fled, making his way to Los Angeles. During the trip, he disposed of the gun and developed an alibi. While seeking medical assistance for his stab wounds, he lied to hospital personnel and police about his identity and the circumstances of his injury.
To be legally insane, a defendant must be in a delusional state preventing him from knowing or understanding the nature of his act or from appreciating the wrongfulness of his act.[10] The record here reveals that the evidence against a finding of insanity was overwhelming. We conclude that Blake suffered no prejudice from the district court's erroneous refusal to advise the jury of the consequences of a verdict of not guilty by reason of insanity. Therefore, we deny relief on this basis.

Preventing-a-lawful-arrest aggravating circumstance
Blake contends that the district court erred in denying his motion to strike the preventing-a-lawful-arrest aggravating circumstance.[11] However, the record does not reveal such a motion or any indication that Blake objected to the submission of this aggravator to the jury. "Failure to object during trial generally precludes appellate consideration of an issue," but "this court has the discretion to address an error if it was plain and affected the defendant's substantial rights."[12] Normally, the defendant must show that an error was prejudicial in order to establish that it affected substantial rights.[13]
Blake argues that a more restrictive definition of this aggravating circumstance should have been applied to his case. He acknowledges that pursuant to Cavanaugh v. State[14] and Evans v. State,[15] this aggravator does not require an imminent arrest, and the victim need not be directly involved in effectuating an arrest. However, Blake encourages this court to overrule Cavanaugh and Evans and apply a more restrictive interpretation. He argues that the principle of ejusdem generis requires "that the items in the statutory listing be interpreted in a manner consistent with or recognizing their commonality." Therefore, according to Blake, since escape from custody necessarily involves contact with those enforcing confinement or custody and the ending of that contact, avoiding or preventing an arrest should likewise be *577 interpreted as involving contact with those involved in effectuating an imminent arrest. However, even assuming that commonality between the two prongs of NRS 200.033(5) is required, escape from custody does not necessarily require any contact with persons enforcing that custody.
Blake also relies on this court's decision in McConnell v. State, in which we stated:
We conclude that although the felony aggravator of NRS 200.033(4) can theoretically eliminate death eligibility in a few cases of felony murder, the practical effect is so slight that the felony aggravator fails to genuinely narrow the death eligibility of felony murderers and reasonably justify imposing death on all defendants to whom it applies.[16]
Blake suggests that in his case, like McConnell, the theoretical application of the preventing-a-lawful-arrest aggravating circumstance may constitutionally narrow the class of persons eligible for the death penalty but that the practical effect is so slight as to render the aggravator unconstitutional. He asserts that virtually every murder case involves some antecedent crime that provides a motive to avoid or prevent an arrest for that crime by murdering the victim. Therefore, Blake argues that although theoretically a case could be envisioned where such preliminary crimes do not exist, such crimes virtually always exist as a practical matter.
Blake's reliance on McConnell is unpersuasive. The concerns expressed by this court in McConnell are not present in Blake's case. In McConnell, this court had to determine, in cases where a first-degree murder conviction is based on felony murder, whether the State may also allege the felony murder's predicate felony as an aggravator.[17] We concluded that dual use of the felony in this way was constitutionally impermissible.[18] Here, the possible antecedent crime that Blake speaks of does not involve any such dual use.
We decline Blake's invitation to depart from our prior holdings on this issue. Strong evidence supported the submission of the preventing-a-lawful-arrest aggravating circumstance to the jury and the jury's finding of the aggravator. Therefore, we deny relief on this basis.

Challenge for cause of prospective juror
Blake argues that the district court erroneously denied his challenge for cause against a prospective juror, depriving him of his right to due process of law in violation of the Fifth, Sixth, and Fourteenth Amendments. Specifically, he contends that the veniremember's answers to voir dire questions demonstrated that he had already determined Blake's guilt. We disagree.
NRS 16.050(1)(f) provides that a challenge for cause may be taken when a prospective juror has "formed or expressed an unqualified opinion or belief as to the merits of the action, or the main question involved therein; but the reading of newspaper accounts of the subject matter before the court shall not disqualify a juror either for bias or opinion." Clearly, a qualified juror need not be completely unaware of the facts and issues of the case at hand. "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard."[19] Rather, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."[20] Because such rulings involve factual determinations, the district court enjoys broad discretion in ruling on challenges for cause.[21]
The veniremember stated that based on media reports, he believed that Blake committed the murders. However, he did not *578 express that his opinion was "unqualified." After further colloquy between the veniremember and defense counsel and the prosecutor, the veniremember unequivocally stated that he could set aside what he had seen and heard about the case, and he twice stated that he could render a decision based on the evidence presented at trial.[22] Based on the record, we conclude that the district court did not abuse its discretion in denying Blake's challenge for cause against the prospective juror.
Nonetheless, even assuming error, we reject Blake's contention that the district court's denial of his challenge for cause deprived him of any constitutional rights by requiring him to utilize one of his peremptory challenges. Peremptory challenges "are a means to achieve the end of an impartial jury."[23] If the jury actually seated is impartial, the fact that a defendant had to use a peremptory challenge to achieve that result does not mean that the defendant was denied his right to an impartial jury.[24] Although Blake exhausted his peremptory challenges, he does not argue that any juror actually empanelled was unfair or biased. Therefore, even if the district court improperly denied his challenge for cause, because Blake exercised a peremptory challenge to remove the veniremember and because he has not shown that any juror actually empanelled was unfair or biased, we conclude that he has not demonstrated any error of constitutional dimension.

Prosecutorial misconduct during penalty phase
Blake claims that the State committed prosecutorial misconduct during the penalty phase of his trial. "To determine if prejudicial prosecutorial misconduct occurred, the relevant inquiry is whether a prosecutor's statements so infected the proceedings with unfairness as to make the results a denial of due process."[25] However, "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be reviewed in context."[26]
First, Blake contends that the prosecutor improperly commented on, over his objection, community standards with statements such as the following: "The death penalty can be viewed as society's expression of outrage," and "[p]unishment achieves a necessary goal in our society." We conclude that these statements were not improper. "[A] prosecutor in a death penalty case properly may ask the jury, through its verdict, to set a standard or make a statement to the community."[27] And a prosecutor may properly discuss "general theories of penology such as the merits of punishment, deterrence and the death penalty."[28]
Next, Blake asserts that the following argument improperly commented on his propensity to commit further crimes:
What will the imposition of the death penalty do in this case? Will it bring back Sophear or [Sheila]? No. Will it bring an absolute end to violence in our society? No. Could the imposition of the death penalty save innocent life in the future by the message it sends? Quite possibly. Will the imposition of the death penalty guarantee that Alfonso Blake never kills again? Most certainly.
*579 Counsel did not object to these comments. Absent objection, generally an appellant must establish that the assigned error was plain and affected his substantial rights.[29] However, NRS 177.055(2)(d) requires this court to consider whether a death penalty has been imposed "under the influence of passion, prejudice or any arbitrary factor." Therefore, we consider whether the challenged remarks were improper and influenced the jury's sentencing decision.[30]
Prosecutors may argue that a defendant poses a future danger where the evidence supports such an argument, but prosecutors cannot argue that the jury must either return a death sentence or take responsibility for the death of a future victim. As we have explained, "[a] prosecutor may still argue that the defendant, if not executed, will pose a threat to the lives of others in the future or that he will kill again. What are prohibited are arguments which, directly or by implication, place responsibility on the jury for the deaths of unknown future victims."[31] We have condemned, for example, a prosecutor's argument to jurors that "whatever the decision is, you will be imposing a judgment of death and it's just a question of whether it will be an execution sentence" for the defendant or for the defendant's future victim.[32]
We conclude that the challenged comments here were proper. The prosecutor suggested that Blake could kill again but did not argue that such a killing was certain or that the jury would bear responsibility for it.

Failure to admonish the jury prior to all recesses of the district court
Blake contends that he was denied his right to a fair trial because the district court failed to admonish the jury pursuant to NRS 175.401 prior to every recess.[33] The record reveals six occasions on which the court did not provide the full statutory admonishment and only reminded the jury that the "same admonishment applies." Four of these were described in the record as brief adjournments. The other two were a noon recess and an afternoon recess, and the record does not indicate their length. The district court fully admonished the jury in accordance with NRS 175.401 before all other recesses.
As we did in Bollinger v. State, we stress the importance of fully admonishing the jury before each and every recess in accordance with the mandatory provisions of NRS 175.401.[34] Therefore, the district court erred in failing to do so. However, the record is devoid of any evidence suggesting that Blake was prejudiced by the district court's omissions in this regard. Accordingly, we deny relief on this basis.

Other matters
Blake claims that he was misled into waiving his right to a preliminary hearing because the State did not file a notice of intent to seek death or reserve its right to do so when it filed the complaint in this case, as was the State's purported customary practice.[35] *580 We conclude that this claim lacks merit. SCR 250(4)(c) clearly provides that the State must file in the district court a notice of intent to seek the death penalty within 30 days after the filing of an information or indictment. The State complied with this requirement, and there is no evidence in the record that the State somehow manipulated or tricked Blake into waiving his right to a preliminary hearing. Accordingly, we deny relief on this basis.
Blake also argues that the district court erred in denying his pretrial motion to prohibit the State from using its peremptory challenges to exclude jurors who express concerns about capital punishment. He argues that using peremptory challenges in this manner renders precisely the same result as that condemned in Witherspoon v. Illinois.[36] However, we have previously considered and rejected a similar claim in Leonard v. State.[37] Accordingly, we deny relief on this basis.
Blake further contends that, over his objection, the district court provided an inadequate jury instruction concerning the presumption of innocence. The challenged instruction tracked the language of NRS 175.191 and provided in part: "The Defendant is presumed innocent until the contrary is proved." Blake argues that the word "until" nullified the presumption of innocence by implying that his guilt would eventually be proven beyond a reasonable doubt. However, read as a whole, the instruction did not imply this. The instruction also defined reasonable doubt in accordance with NRS 175.211 and concluded: "If you have a reasonable doubt as to the guilt of the Defendant, he is entitled to a verdict of not guilty." The instruction plainly contemplated that guilt might not be proven. Accordingly, we deny relief on this basis.
Blake next contends that the district court erred in refusing to allow him to display as demonstrative exhibits at the penalty hearing photographs depicting a prison cell and a gurney used during lethal-injection executions. We conclude that the district court's ruling was not erroneous,[38] and we deny relief on this basis.
Blake also contends that due process considerations required allowing the defense to argue last at the penalty hearing. He complains that NRS 200.030 shifts the burden of proof by requiring the defense to present evidence in mitigation and the defendant should therefore have the last opportunity to plead for his life before jury deliberations. However, we have previously considered and rejected such claims.[39] Moreover, NRS 175.141(5) provides that the State shall argue last, as this court has repeatedly noted.[40] Accordingly, we conclude that this claim lacks merit.
Blake next raises several objections to Nevada's use of lethal injection and to the death penalty generally. However, we have previously upheld as constitutional Nevada's use of lethal injection and the death penalty.[41] Accordingly, we deny relief on this basis.

Mandatory statutory review of the death penalty
NRS 177.055(2) requires this court to review every death sentence and independently consider:

*581 (c) Whether the evidence supports the finding of an aggravating circumstance or circumstances;
(d) Whether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor; and
(e) Whether the sentence of death is excessive, considering both the crime and the defendant.
Respecting the first question, sufficient evidence supported the three aggravating circumstances. First, Blake's conviction of the attempted murder of Kim Choy supported the jury's finding that prior to the penalty hearing Blake had been convicted of a felony involving the use or threat of violence against another person. Second, as previously discussed, there was sufficient evidence indicating that Blake committed the murders to avoid or prevent a lawful arrest. Finally, the jury found that in the immediate proceedings Blake had been convicted of more than one offense of murder, having been convicted of murdering both Sophear and Sheila.
We further conclude that the jury did not act under an improper influence in imposing death. Blake deliberately and systematically shot three young women in the head, yet jurors found three mitigating circumstances. Although the jury was not persuaded by Blake's insanity defense, his mental and emotional state was found to be a mitigating circumstance. Additionally, Blake's expression of remorse and the lack of evidence of any long-standing plan to commit murder were considered mitigating circumstances. There is nothing in the record showing that the jury acted under the influence of passion, prejudice, or any other arbitrary factor.
Finally, the evidence shows that Blake executed 19-year-old Sophear and 22-year-old Sheila and tried his level best to execute 22-year-old Kim, who survived only by amazing luck. His evidence in mitigation carried little weight. We conclude that considering Blake and his crime, the sentence of death is not excessive.

CONCLUSION
For the reasons discussed above, we conclude that no errors occurred at trial warranting relief. Therefore, we affirm the judgment of conviction and sentence of death.
ROSE, DOUGLAS, MAUPIN, PARRAGUIRRE, JJ., concur.
BECKER, C.J., with whom HARDESTY, J., agrees, concurring in part and dissenting in part.
I concur in the majority opinion with one exception, the district court did not err in refusing to instruct the jury on the consequences of a verdict of not guilty by reason of insanity for the simple reason that Blake presented no evidence that he was legally insane under the M'Naghten standard and Finger v. State.[1]
Dr. Mortillaro testified that Blake suffered from a compromised mental state and he had difficulty determining right from wrong. Neither satisfies the legal definition of insanity under Finger. As noted in Finger, Nevada has applied the strictest definition of insanity for over one hundred years.[2] This standard permits a finding of legal insanity only if at the time of the killing, a delusional state: (1) rendered the defendant incapable of knowing or understanding the nature of his act, i.e., that he was killing a human being, or (2) prevented the defendant from appreciating the wrongfulness of his act, i.e., that the killing was not justified under the law.[3]
Nothing in the record supports that Blake thought he was killing something other than a human being. The record also does not contain evidence to support that Blake, in a delusional state, thought the killings were justifiable homicide and that the facts of his delusion, if true, would support such a mistaken belief.
Because I conclude no evidence supported submitting an insanity defense to the jury, I *582 find no error in failing to instruct the jury on the consequences of an insanity acquittal.
HARDESTY, J., concur.
NOTES
[1] Petrocelli v. State, 101 Nev. 46, 692 P.2d 503 (1985), modified on other grounds by Sonner v. State, 112 Nev. 1328, 1334, 930 P.2d 707, 711-12 (1996), and superseded by statute on other grounds as stated in Thomas v. State, 120 Nev. 37, 45, 83 P.3d 818, 823 (2004).
[2] See Anderson v. Berrum, 36 Nev. 463, 469, 136 P. 973, 975-76 (1913) ("In this, and in most jurisdictions in this country, the cross-examination must be limited to matters stated in the examination in chief and questions to test the accuracy, veracity, and credibility of the witness.... On cross-examination it is competent to call out anything to modify or rebut the conclusion or inference resulting from the facts stated by the witness on his direct examination."). See generally Singleton v. State, 90 Nev. 216, 219, 522 P.2d 1221, 1222-23 (1974) (holding that the credibility of a source used by an expert witness in arriving at an opinion is an underlying fact properly pursued in cross-examination).
[3] Blake also argues that the district court erred in denying his motion for new trial based on the State's alleged improper cross-examination of Dr. Mortillaro. Based on the foregoing discussion, we conclude that the district court did not err in denying Blake's motion.
[4] See NRS 174.035(4).
[5] Blake also argued that the district court erred in denying his motion for new trial based on this claim. We conclude that Blake's contention lacks merit.
[6] See NRS 175.539.
[7] E.g., Harris v. State, 106 Nev. 667, 670, 799 P.2d 1104, 1106 (1990); Bean v. State, 81 Nev. 25, 33, 398 P.2d 251, 256 (1965); Kuk v. State, 80 Nev. 291, 299-300, 392 P.2d 630, 634 (1964).
[8] Bean, 81 Nev. at 33, 398 P.2d at 256.
[9] Harris, 106 Nev. at 670, 799 P.2d at 1106.
[10] Finger v. State, 117 Nev. 548, 576, 27 P.3d 66, 84-85 (2001).
[11] See NRS 200.033(5) (providing that a first-degree murder is aggravated if it "was committed to avoid or prevent a lawful arrest or to effect an escape from custody").
[12] Gallego v. State, 117 Nev. 348, 365, 23 P.3d 227, 239 (2001); see NRS 178.602 ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").
[13] Gallego, 117 Nev. at 365, 23 P.3d at 239.
[14] 102 Nev. 478, 729 P.2d 481 (1986).
[15] 112 Nev. 1172, 926 P.2d 265 (1996).
[16] 120 Nev. ___, ___, 102 P.3d 606, 624 (2004).
[17] Id. at ___, 102 P.3d at 620-24.
[18] Id. at ___, 102 P.3d at 624.
[19] Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).
[20] Id.
[21] Leonard v. State, 117 Nev. 53, 67, 17 P.3d 397, 406 (2001).
[22] See Snow v. State, 101 Nev. 439, 445-46, 705 P.2d 632, 637-38 (1985).
[23] Ross v. Oklahoma, 487 U.S. 81, 88, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988).
[24] Id.; see also Hernandez v. State, 118 Nev. 513, 533-34 & n. 53, 50 P.3d 1100, 1114 & n. 53 (2002).
[25] Thomas v. State, 120 Nev. 37, 47, 83 P.3d 818, 825 (2004) (citing Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)).
[26] United States v. Young, 470 U.S. 1, 11, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); see Hernandez, 118 Nev. at 525, 50 P.3d at 1108; Steese v. State, 114 Nev. 479, 496, 960 P.2d 321, 332 (1998).
[27] Williams v. State, 113 Nev. 1008, 1020, 945 P.2d 438, 445 (1997); see Schoels v. State, 114 Nev. 981, 987, 966 P.2d 735, 739 (1998), rehearing granted on other grounds, 115 Nev. 33, 975 P.2d 1275 (1999).
[28] Witter v. State, 112 Nev. 908, 924, 921 P.2d 886, 897 (1996); see Evans v. State, 117 Nev. 609, 632, 28 P.3d 498, 514 (2001).
[29] See NRS 178.602; Gallego, 117 Nev. at 365, 23 P.3d at 239.
[30] Butler v. State, 120 Nev. ___, ___, 102 P.3d 71, 85 (2004).
[31] Schoels, 114 Nev. at 988-89, 966 P.2d at 740; see also Castillo v. State, 114 Nev. 271, 279, 956 P.2d 103, 109 (1998).
[32] Castillo, 114 Nev. at 279-80, 956 P.2d at 109.
[33] NRS 175.401 provides:

At each adjournment of the court, whether the jurors are permitted to separate or depart for home overnight, or are kept in charge of officers, they must be admonished by the judge or another officer of the court that it is their duty not to:
1. Converse among themselves or with anyone else on any subject connected with the trial;
2. Read, watch or listen to any report of or commentary on the trial or any person connected with the trial by any medium of information, including without limitation newspapers, television and radio; or
3. If they have not been charged, form or express any opinion on any subject connected with the trial until the cause is finally submitted to them.
[34] 111 Nev. 1110, 1114, 901 P.2d 671, 674 (1995); see also State v. Lewis, 59 Nev. 262, 91 P.2d 820 (1939).
[35] We note that Blake does not assert that he was entitled to a probable cause determination regarding any of the alleged aggravating circumstances.
[36] 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).
[37] 114 Nev. 1196, 1205, 969 P.2d 288, 294 (1998); see Kaczmarek v. State, 120 Nev. 314, 335, 91 P.3d 16, 30 (2004) (stating that a juror's "hesitance to impose the death penalty is a permissible and race-neutral reason for exclusion" through a peremptory challenge).
[38] See generally Westenbarger v. State, 91 Nev. 478, 479, 537 P.2d 1195, 1196 (1975); see also Boyd v. State, 92 Nev. 73, 74, 545 P.2d 202, 202 (1976).
[39] Witter, 112 Nev. at 922-23, 921 P.2d at 896; see also Snow, 101 Nev. at 448, 705 P.2d at 639.
[40] Johnson v. State, 118 Nev. 787, 805-06, 59 P.3d 450, 462 (2002); Hernandez, 118 Nev. at 534, 50 P.3d at 1114; Witter, 112 Nev. at 923, 921 P.2d at 896; see also NRS 175.151.
[41] See McConnell, 120 Nev. at ___, 102 P.3d at 616; Rhyne v. State, 118 Nev. 1, 14, 38 P.3d 163, 171-72 (2002); Servin v. State, 117 Nev. 775, 785-86, 32 P.3d 1277, 1285 (2001); Middleton v. State, 114 Nev. 1089, 1116-17, 968 P.2d 296, 314-15 (1998).
[1] 117 Nev. 548, 27 P.3d 66 (2001).
[2] Id. at 562, 27 P.3d at 75-76.
[3] Id. at 556-57, 27 P.3d at 72.